TRI–COUNTY LANDFILL, INC., Appellant

v.

**PINE TOWNSHIP ZONING HEARING BOARD, and Dr. Ray Yourd, Diana Hardisky, Eric Lindh and Polly Lindh, Bill Pritchard and Lisa Pritchard, Dave Dayton and Anne Dayton, Doug Bashline and The Grove City Factory Shops Limited Partnership.**

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 2013.

Decided Jan. 9, 2014.

---

**4.** Claimant testified that "Paul is probably a hundred pounds more than me." (N.T. at 7–8.)

Clifford B. Levine, Pittsburgh, for appellant.

Robert B. McKinstry, Jr., Philadelphia, for appellee The Grove City Factory Shops Limited Partnership.

Charles M. Means, Pittsburgh, for appellees Pine Township and Pine Township Zoning Hearing Board.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

In this case, one of two related, complex land use appeals, Tri–County Landfill, Inc. (Tri–County) asks whether the Court of Common Pleas of Mercer County (trial court) erred in denying its appeal and affirming (essentially in part) the decision of the Pine Township Zoning Hearing Board (ZHB) that denied Tri–County's numerous requests for zoning approval for its proposed landfill. Tri–County argues that, where doubt exists as to whether or not the ordinance's definition of "structure" can be read to encompass "landfills," the trial court erred by failing to acknowledge that inherent ambiguity and by failing to interpret the Pine Township Zoning Ordinance (zoning ordinance) in favor of the landowner as the Pennsylvania Municipalities Planning Code[1] (MPC) requires. It further asserts the trial court erred in failing to address the unconstitutional and exclusionary effect of the zoning ordinance's 40–foot height limitation. Tri–County also contends that the trial court failed to require the appropriate variances. Upon review, we affirm.

## I. Factual and Procedural Background

In October 2010, Tri–County filed an application with the ZHB, seeking zoning approval for its proposed landfill. The proposed landfill site would occupy approximately 99 acres in Mercer County, approximately half of which lie in Pine Township. The remaining half would lie within Liberty Township. Tri–County's proposal for the portion of the proposed landfill that lies in Liberty Township is addressed in the separate, related appeal of *Tri–County Landfill, Inc. v. Liberty Township Board of Supervisors*, 2014 WL 97316 (Pa. Cmwlth., No. 175 C.D.2013, filed January 9, 2014) (unreported).

Through its application to the ZHB, Tri–County sought the following alternative forms for relief: (1) an appeal from the zoning officer's denial of a certificate of use and occupancy for its "existing," nonconforming landfill use; (2) a request for a use variance; (3) a request for a dimensional variance from the zoning ordinance's 40–foot height limitation; and, (4) a challenge to the zoning ordinance based on its alleged *de facto* exclusion of landfills, together with a request for site specific relief.

Numerous hearings ensued before the ZHB, including two joint hearings with the Liberty Township Board of Supervisors. In the course of the hearings before the ZHB, Tri–County amended its application to include the additional, alternative legal bases of variance by estoppel and laches.

The ZHB heard 55 hours of testimony. Witnesses for Tri–County included Ed Vogel, one of its owners, James Echard, a civil engineer, and John Blazosky, a civil and environmental engineer. Several area residents testified in opposition to the proposed landfill. Additionally, Richard Grossman, a land planning expert, and James Lawrence Hosmer, a professional engineer, testified on behalf of Objectors.[2]

### ZHB Findings

Based on the evidence presented, the ZHB issued extensive findings of fact as

---

1. Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §§ 10101–11202.

2. Objectors are Pine Township, Grove City Factory Shops Limited Partnership, as well as Dr. Ray Yourd, Diana Hardisky, Eric and Polly Lindh, Bill and Lisa Pritchard, Anne and Dave Dayton, and Doug Bashline.

well as a memorandum opinion containing legal analysis and conclusions. We summarize the ZHB's findings as follows.

The zoning ordinance was first enacted on October 13, 1976 with subsequent amendments in 1984 and 1997. Since the original zoning ordinance in 1976, the property at issue here has been zoned R–1 Residential Rural. Despite 35 years of activity at this *residential* site since the enactment of the zoning ordinance, this is the first time any application was presented to the ZHB for any relief from the zoning ordinance.

Edward and Margaret Vogel first purchased the subject property in 1975. Since 1975, the Vogel family and its related entities (Tri–County Industries, Inc. and Tri–County Landfill, Inc.) conducted various landfill and transfer station activities at this Pine Township site. The ZHB stated it was called upon to make sense of this 35–year history of neglect of the Pine Township zoning ordinance by Tri–County, the Department of Environmental Protection (formerly the Department of Environmental Resources) (DEP) and Pine Township.

### Zoning for Sanitary Landfills

Section 900 of the zoning ordinance provides for an I Industrial zoning district, the purpose of which is to provide "a Zoning District which will encourage the establishment and maintenance of industrial uses and particular business uses which will discourage the establishment of residential and other uses which are inappropriate in an Industrial Zoning District." ZHB Op., 10/29/11, Finding of Fact (F.F.) No. 8.

Section 901.1(12) (Industrial Zone) of the zoning ordinance provides for sanitary landfills, solid waste transfer stations, or similar facilities for processing and dispos-

al of solid waste by conditional use. F.F. No. 9.

### Non-conforming Use Provisions

Article XV of the zoning ordinance sets forth regulations governing non-conforming uses, structures and lots. Specifically Section 1502 of the zoning ordinance, which concerns non-conforming uses of land, states:

Where, at the effective date of adoption or amendment of this ordinance, lawful use of land exists that is made no longer permissible under the terms of this ordinance as enacted or amended, such use may be continued, so long as it remains otherwise lawful, subject to the following provisions:

1502.1—No such non-conforming use shall be enlarged or increased, nor extended to occupy a greater area of land than was occupied at the effective date of adoption or amendment of this ordinance, except as specified by Section 1500 of this ordinance.

1502.2—No such non-conforming use shall be moved in whole or in part to any other portion of the lot or parcel occupied by such use at the effective date of adoption of amendment of this ordinance.

1502.3—If any such non-conforming use of land ceases for any reason for a period of more than twelve (12) consecutive months, any subsequent use of such land shall conform to the regulations specified by this ordinance for the district in which such land is located.

F.F. No. 10.

Prior to the 1997 zoning ordinance amendments, Section 1502.3 stated, "if any such non-conforming use of land ceases for any reason for a period of more than thirty (30) days, any subsequent use of such land shall conform to the regulations specified by th[e] [zoning] [o]rdinance for the dis-

trict in which such land is located." F.F. No. 11.

## Residential Zoning

Section 400 of the zoning ordinance sets forth the permitted principal and accessory uses in the R–1 zoning district. Neither sanitary landfills nor solid waste transfer stations are permitted in the R–1 district.

## Height Limitation

Section 402.1 of the zoning ordinance provides that any building used for the storage of agricultural products or machinery is not limited in height. Section 402.2 of the zoning ordinance sets forth the maximum height requirements for the R–1 district, and it states that "principal structures shall not exceed 40 feet in height." F.F. No. 13. The storage of agricultural products and machinery is the only exception to the 40–foot height restriction in the R–1 district. Forty feet is the height restriction throughout the zoning ordinance except for a few limited exceptions set forth under Section 1402 Supplemental Height Regulations—sanitary landfills and transfer stations are not listed exceptions. Other than the storage of agricultural products and machinery and the exceptions listed in Section 1402, the zoning ordinance universally provides for a 40–foot height restriction.

## Lack of Zoning Approvals

Notwithstanding the sections above concerning non-conforming uses, Tri–County expanded the landfill area over the years without zoning approval and wishes to expand again under its present application, this time with ZHB approval. Additionally, notwithstanding the section of the zoning ordinance concerning nonconforming uses, Tri–County has put in place a transfer station that is not in conformance with the R–1 district regulations, but is specifically provided for in an industrial district with approval of the local governing body. Further, notwithstanding the section of the zoning ordinance concerning non-conforming uses, Tri–County wishes to expand the area of the landfill from approximately 26 acres to a total of 94 acres.

Using a parcel of land as a dump or landfill or more modern landfill area and expansion of that use in a R–1 district requires ZHB approval, as does the use of an area in a R–1 district for a transfer station. Those activities are restricted to industrial zoning districts under the zoning ordinance.

## Landfill Use at the Property and DEP Involvement

In August 1976, Tri–County Industries, Inc. and Edward and Margaret Vogel first filed an application for solid waste disposal (Phase I application) with the Department of Environmental Resources (DER, later known as DEP, and referred to as DEP throughout this opinion for clarity) seeking a permit for 90 acres on a 212–acre site. In that application, there was a section requesting information regarding zoning, and in the answers to the questions posed in the application, the applicants represented that there was no zoning ordinance and that the site was previously used for a landfill. Other questions asked whether zoning of the site permitted a sanitary landfill, and the applicants answered in the affirmative. The same section also inquired about properties within a quarter mile of the site, and the applicants responded that the properties to the north, east, south, and west were all agricultural.

Various revisions were made to the Phase I application in September 1977, but no revision was made to the zoning information even though the zoning ordinance was enacted in October 1976. In addition, a Phase II application was prepared in

September 1977, and no revision was made to this application concerning zoning, nor was any approval sought from the ZHB for the landfill in a R–1 district. The 1977 application projected a total of 37,500 tons per year and a maximum daily volume or weight of 380 cubic yards and 71 tons of weight.

DEP ultimately denied the 1976 application, and a consent order and adjudication was entered into in August 1982. The pertinent portion of that order stated that Tri–County did not presently have a permit to operate a solid waste disposal facility on its property in Mercer County. The order also stated that on December 8, 1981, DEP issued Tri–County an administrative order, requiring, among other things, phased closure of the landfill operation and submission of various plans and bonds.

Paragraph J of the 1982 consent order and adjudication stated that: "Tri–County desires to continue operating the Landfill—Old Area while [DEP] reviews additional information to be submitted by Tri–County regarding the Landfill—New Area." ZHB Mem. Op. at 7. Based upon the application and the findings in the consent order and adjudication, the ZHB stated, it appeared that Tri–County was attempting to expand operations and a non-conforming use to a new area. Pursuant to Section 1502.1 of the zoning ordinance, any such expansion required ZHB approval. The ZHB stated that a ZHB hearing at that time "would have given guidance to Vogel, Pine Township, and surrounding property owners but it did not happen—thus millions of dollars have been spent working with assumptions that may not exist." ZHB Mem. Op. at 7. "Old and new property owners have assumed they live in [a] R–1 zone and Vogel assumes they can operate and expand the landfill." *Id.*

The ZHB found that the only area where "landfill" operations had and were taking place through 1982 was the "old" area. F.F. No. 26. Tri–County was attempting to expand operations and its nonconforming use to a "new" area without zoning approval which, under the provisions governing the R–1 zoning district, was required. F.F. No. 27.

A new Phase I application was prepared in November 1982, which reduced the number of acres proposed for a permit from 90 acres of a 212 acre site to 49.2 acres of the 212 acre site, including both new and old areas. In this phase of the application, the zoning issue was not discussed, nor was any application made to the ZHB for any relief on this R–1 site for expansion of a nonconforming use.

A Phase II application was prepared in April 1983, and revised in March 1984, requesting approval for a maximum daily volume or weight of 1000 cubic yards per day as opposed to a maximum of 380 cubic yards on the 1977 application. A narrative report accompanying the Phase II application indicated the "old area" as approximately 19 acres and the "new area" as a 30–acre landfill. F.F. No. 30. Therefore, the ZHB stated, the total area for the disposal of waste until March 1984 could be no more than 19.2 acres because the new area was never approved or used prior to that time. "Therefore, the largest disposal area that could be 'grandfathered' in 1983 was 19.2 acres." ZHB Mem. Op. at 8. At this time, the ZHB explained, there was still no application to the ZHB for any relief under the zoning ordinance based on the new applications in 1982 and 1983. "This appears to be an expansion of a non-conforming use in [a] R–1 zone." *Id.*

DEP issued Tri–County Industries a permit in September 1985, based on Phase I and Phase II design reports and draw-

ings submitted by Todd Giddings and Associates from 1983 to 1985. The permit itself does not state the exact size of the area under permit. However, the design reports and drawings submitted by Todd Giddings and Associates indicate that the area at issue consisted of the 49.2–acre area referenced above, which included the "old" and "new" area. F.F. No. 36.

Vogel renewed landfill operations in 1985 based on the DEP permit issued in September 1985. Disposal of waste was continued in the "old area" and expanded into the new area based on the permit, despite the facts that no request was submitted to the ZHB for expansion of a nonconforming use and that the zoning ordinance was in place for over nine years.

Prior to 1985, disposal of waste only occurred on approximately 19.2 acres of the "old area." F.F. No. 39. Any expansion of the disposal of waste beyond the 19.2 acres of the "old area" required ZHB approval based on the zoning ordinance in effect at that time. F.F. No. 40.

New municipal waste management regulations were published in the Pennsylvania Bulletin in April 1988. These required, among other things, that landfills meet new standards, including the use of sophisticated liners under the refuse.

**1990 Cessation of Landfill Activities**

After various administrative proceedings, a consent order and adjudication was entered into in April 1990, which required Tri–County Industries, Inc. to cease accepting municipal waste at the landfill as of September 1, 1990. F.F. No. 42. There has not been any landfill operation on the subject property since September 1, 1990. ZHB Mem. Op. at 8.

On September 10, 1990, Attorney Ronald L. Kuis of Kirkpatrick & Lockhart wrote to DEP and represented to the DEP on behalf of Tri–County Industries, as follows:

I. *Closure at Tri–County.* Under separate cover, Harald Pedersen will provide to [DEP] a revised closure plan covering the Tri–County landfill. For your information, this closure plan will identify approximately four to five acres of the landfill that will be closed pursuant to current Pennsylvania regulations. This acreage represents the area in which municipal waste has been place [sic] since April 8, 1988. Previous closure plans provided to [DEP] for Tri–County were based on assumptions regarding continued future use at this site. Accordingly, those closure plans previously submitted by Tri–County no longer are applicable. Because of the change in acreage, it will be necessary to revise both the bonding amounts for Tri–County, as well as the designated area subject to closure.

II. *Operation and Closure at Vogel Disposal* (language not applicable to this case . . . [ ) ]

The closing paragraphs provide:

At this time, we see no legal duty to close landfill acreage that was subject to disposal and closure activities prior to April 8, 1988. Acreage at both Tri–County and at Vogel Disposal that received waste prior to April 8, 1988, has been closed subject to earlier requirements of [DEP] or the Bureau of Mines. The amended closure plans to be provided by Mr. Pedersen will clarify the affected acreage and the schedules to be followed pursuant to those plans.

Because of the change in business planning brought about by the permit denials issued by [DEP], both Tri–County and Vogel Disposal will be proceeding with operations in a manner different from that originally expected. Both parties are willing to meet with [DEP]

and its representatives to discuss any of the foregoing.

F.F. No. 43. With regard to the purpose of this letter, the ZHB explained:

It appears the intention of the letter was to formalize with [DEP] that Tri–County was not going to do anything further with the old area and they were attempting to minimize the acreage in the new area that would require closure. The letter certainly indicates that they were going to close the operation at Tri–County and they were going to operate and close portions of Vogel Disposal at Seneca.

ZHB Mem. Op. at 9.

In November 1990, Tri–County Industries, Inc. and DEP entered into another settlement agreement, which in addition to providing for closure procedures for the landfill, stated that DEP agreed to:

... recalculate the bond required for closure based on the actual acreage affected and other factors primarily related to the cost of soil used for final cover. The parties agree that the acreage affected is 6.7 acres rather than 12.4 acres and that the bond requirement is 704,-000 dollars rather than 2.1 million dollars. [DEP] amended the Closure order on November 15, 1990 to reflect these changes.

Paragraph 1 of this same Order provided that:

Upon approval of this Settlement Agreement by the [Environmental Hearing] Board [ (Board) ], Tri–County's appeal at Board Docket No. 90–215–E shall be discontinued and terminated with prejudice.

Paragraph 8 of this same Order provided that:

The Amended Closure Order shall terminate if [DEP] should issue a permit under the new municipal waste regulations to reopen and operate the Landfill.

F.F. No. 44. The November 1990 Settlement Agreement also provided:

3. The Amended Closure Order is modified as follows:

a. Paragraph 1 'The Closure Plan submitted March 30, 1990, as revised April 9, April 24, 1990, including [DEP's] letter of October 30, 1990, (relating to groundwater monitoring requirements) is incorporated by reference herein as an obligation of this Order as if set forth at length. Tri–County shall begin implementation of the approved closure plan in accordance with the schedule of implementation UPON THE DENIAL OF TRI–COUNTY'S REPERMITTING APPLICATION and proceed to properly cap 6.7 acres of the Landfill in accordance with the requirements of 25 Pa. Code § 273.234 using a synthetic cap as specified in the Closure Plan,' IF TRI-COUNTY FAILS TO SUBMIT A RE-PERMITTING APPLICATION BY FEBRUARY 1, 1991 TRI–COUNTY SHALL BEGIN IMPLEMENTATION OF THE CLOSURE PLAN BY FEBRUARY 1, 1991. (Emphasis added by Tri–County)

F.F. No. 45. Tri–County *Industries* did not appeal this settlement agreement, nor did Tri–County *Industries* apply for a new permit or submit any application to DEP.

F.F. No. 46.

On February 1, 1991, Tri–County *Landfill, Inc.* (presumably a new entity) submitted a letter to DEP's Bureau of Waste Management indicating that Tri–County Landfill, Inc. was submitting for its review, a Phase I and Phase II application for permit modification and indicating Tri-County Landfill, Inc. was substituting itself for the former corporation in requesting a permit.

Tri–County Landfill, Inc. was not incorporated until May 1991. As such, the ZHB stated, "the February 1, 1991 application was submitted by a nonexistent company with no legal ability to do anything." F.F. No. 48. Thus, the ZHB stated, Tri–County did not meet the requirements of the November 1990 settlement agreement.

### 1990 Opening of Transfer Station

In September 1990, DEP issued Tri–County Landfill, Inc. an emergency permit for a transfer station, which provided, among other things:

3. Municipal waste may only be received at the Emergency Transfer Station from those counties which have been previously disposing at the landfill. These include Butler, Clarion, Crawford, Lawrence, Mercer, and Venango counties.

4. The operator may not allow municipal waste to remain at the Emergency Transfer Station at the end of the day. For this purpose, the end of the day shall be 9:00 p.m.

F.F. No. 51.

In February 1992, Tri–County Landfill, Inc. was issued a permit (as opposed to the previously issued emergency permit) for the operation of a transfer station along with amendments to the permit by virtue of a settlement agreement executed in July 1992.

The ZHB explained that a solid waste transfer station is a separate and distinct entity from a sanitary landfill and is recognized as such under Section 901.1(12) of the zoning ordinance and by DEP. Tri–County Landfill, Inc. has a permit for a transfer station but not a landfill. F.F. No. 53. A solid waste transfer station is only permitted in an industrial zone, and then only with approval by the local governing body. The ZHB found that a transfer station never existed on this property prior to 1990. F.F. No. 55.

Further, the ZHB found, since September 1990, Tri–County Landfill, Inc. continuously operated a transfer station on the property, expanded buildings and operations, constructed a new road to the transfer station and generally operated in the R–1 district as if it had approval to operate in an industrial district. F.F. No. 57.

The ZHB found that Pine Township was aware of the activities at the subject property and did not stop any expansion of the transfer station or require Tri–County Landfill, Inc. to obtain any relief from the R–1 district regulations. F.F. No. 58.

In 1994, Edward and Margaret Vogel transferred 94 acres of the 212–acre site to Tri–County Landfill, Inc. The transfer station itself, along with a few acres, remained in the Vogels' possession. The Vogel family or related entities under their control, own approximately 500 acres, which includes the Tri–County Landfill, Inc. site, the transfer station and surrounding properties.

The ZHB found that the total prior "disposal area" is approximately 26 acres which includes the 19.2 acres of "old area" and 6.7 acres of "new area," which was required to be closed under the 1990 consent agreements. F.F. No. 62. The ZHB stated this area constitutes approximately 5% of the property owned by Vogel and Tri–County Landfill, Inc.

Since the transfer station was erected and permitted in 1992, Tri–County Landfill, Inc. has pursued a solid waste landfill permit for the site. F.F. No. 63. The history of the permit application "has been long and tortuous," including a decision by the Pennsylvania Supreme Court on the case in 2005, in which Tri–County was a party. F.F. No. 64 (citing *Eagle Envtl. II*,

*L.P. v. Dep't of Envtl. Prot.,* 584 Pa. 494, 884 A.2d 867 (2005)).

Since closure of the landfill in September 1990, and the issuance of the emergency transfer station permit, which also occurred in September 1990, until the present time, Tri–County Landfill, Inc. has operated a transfer station on the property. F.F. No. 65. Since 1992, there have been several actions and permits to expand and modify the transfer station— all approved by DEP, but not by the ZHB. F.F. No. 66. Since September 1990, no permit for a landfill was issued for this site. F.F. No. 67.

Tri–County Landfill, Inc. expended between $4 and $5 million attempting to obtain a new landfill permit prior to submitting any requests to the ZHB. F.F. No. 74. Tri–County's operation, whether as a landfill or a transfer station, is a profitable business at the subject property. F.F. No. 75.

### Definition of "Structure" and its Application

The zoning ordinance defines a "structure" as: "A combination of materials forming a construction for occupancy and/or use including among other[s], a building, stadium, gospel tent, circus tent, reviewing stand, platform, staging, observation tower, radio tower, water tank, trestle, pier, wharf, open shed, coal bin, shelter, fence, wall and a sign." F.F. No. 76. Black's Law Dictionary defines a structure as: "Any construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner ... That which is built or constructed; an edifice or building of any kind." F.F. No. 77. Webster's New World Dictionary defines structure as: "1. Manner of building, constructing, or organizing; 2. Something built or constructed, as a building or dam; 3. The arrangement of all the parts of a whole; 4. Something composed of interrelated parts.—tured,— turing—to put together according to a system." F.F. No. 78.

Documentary evidence presented at the ZHB hearings detail "a Typical Liner System Profile from the Subgrade/Structural Fill to the Final Cover. A modern [l]andfill is a complex highly engineered system." F.F. No. 79. In summary, a modern landfill is constructed as follows:

1. A smooth soil bed is first prepared.

2. The liner material is laid down ( [non-woven] geotextile fabric)[.]

3. HDPE [High Density Polyethylene] black plastic liner is laid down (60 mil thick)[.]

4. A secondary liner is placed on top.

5. Between the two liners are two layers of drainage net.

6. On top of this is another nonwoven geotextile material.

7. 18 inches of #8 stone is placed on top (pea gravel).

8. Finally, on top of these 9 layers of material, eight feet of 'select garbage' is placed.

9. Once the 'select garbage' is placed and covered by six inches of soil, the landfill is prepared to be up and running and ready to accept any type of refuse.

F.F. No. 80. Incorporated within the above-described liner system is a "Leachate Collection System, including at the lowest level, a sump pump, which pumps the leachate into a storage tank." F.F. No. 81. "Page 2 of Exhibit 10 shows the Typical Liner System Profile and a Typical Cap System Profile and there is a Leachate Collection Plan/CM Layout included ... along with the Leachate Collection system profile and a complex Perimeter Berm Detail. In addition to all these systems, there is a Landfill Gas Extraction

System constructed within the landfill." *Id.*

The ZHB found: "A modern landfill design engineered and proposed to be placed at this site is a structure." F.F. No. 82. Any structure constructed at this site, unless it relates to storage of agricultural products or machinery, is subject to a 40 feet height limitation. F.F. No. 83.

### Impact of Landfill on Nearby Uses

The ZHB also found it was preempted by state and federal regulations concerning "'bird strikes' and the distance of a landfill from the [Grove City] [A]irport." F.F. No. 86. The ZHB explained the zoning ordinance was silent on this issue, and there was no basis for the ZHB to make a decision on the impact of birds and the airport located in Springfield Township and owned by Grove City Borough. "To even consider the issue, the ZHB found, would have required Grove City Borough and/or the operators of the airport to intervene." F.F. No. 86.

However, as part of the "bird strike mitigation program," the ZHB found, substantial evidence was presented that placement of putrescible waste must occur at night. F.F. No. 87. The ZHB found the lights required by a nighttime operation would, by necessity, be similar to other nighttime construction one might see along a highway and would be incompatible with a R–1 district—especially as the structure is raised above ground level and during the winter months where trees would be barren. While a farmer might occasionally operate at night during the spring planting season or the fall harvesting season, the ZHB stated, the proposed landfill operation would operate every night all year long.

The ZHB further found that, "[b]y the nature of the proposed landfill operation, dust particles will be produced." F.F. No.

88. "The prevailing wind in the area is west to east which means most of the dust and particulate matter will blow away from the [Grove City Factory] [S]hops but toward more residential areas in the Township." *Id.* The ZHB explained that it "requested more detailed information from [Tri–County] concerning the predicted dust pattern and the amounts that would be blown off site. Despite that request, nothing was presented beyond what is in the exhibits." *Id.* "Any particulate matter blowing off the site beyond dust from a farming operation would be incompatible with [a] R–1 site." *Id.*

The ZHB further explained a solid waste transfer station and a sanitary landfill are separate and distinct entities. A modern landfill requires construction of a complex liner system, a leachate collection plan and a landfill gas extraction system. The landfill is just that—filling the area of the land it occupies with refuse and leaving it on the land—presumably forever. However, a transfer station is simply a means of gathering refuse from small neighborhood collection trucks, dumping the load inside a building, and then loading the collected waste on a much larger truck to haul to a landfill. No waste stays on the property.

Based on this background, the ZHB explained it was only "concerned with ... the 19.2 acres of the old area and the 6.7 acres of the new area totaling 25.9 acres." ZHB Mem. Op. at 12. The ZHB determined the issues before it were whether landfill operations on those areas properly occurred absent any zoning approval, and whether the use of the 25.9 acres as a landfill was abandoned in 1990.

### Abandonment of Non-conforming Use

As of September 1990, the ZHB stated, it appeared Tri–County Industries had every intention and specifically stated it

planned to close the landfill in Pine Township. Based on the consent orders and the letter from Tri–County Industries' attorney, the ZHB determined, it could not draw any other conclusion. The ZHB determined the combination of the consent orders along with the closure letter from Tri–County Industries' attorney evidenced abandonment of the landfill use. To that end, as of 1990, the zoning ordinance stated a presumption of abandonment occurred after 30 days of non-use (although this was later amended to 12 months).

In addition, the ZHB determined, Tri–County did not meet the requirements of the November 1990 settlement agreement. The settlement agreement provided that in the event Tri–County failed to submit a re-permitting application by February 1, 1991, a closure plan had to be implemented. Tri–County *Industries* did not submit any application to DEP. The ZHB acknowledged that Tri–County *Landfill, Inc.* submitted an application on February 1, 1991. However, Tri–County Landfill, Inc. had no legal authority to take such action at that time because it was not a legal entity. The incorporation papers for Tri–County Landfill, Inc. were not filed until May 1991; therefore, any action taken by Tri–County Landfill, Inc. had no basis in fact or law.

The ZHB stated the above facts, coupled with the fact that Tri–County obtained an emergency permit to operate a transfer station at the site, as opposed to a landfill, altered the entire character of the operation. These facts indicated that at that time Tri–County was, in fact, changing its business plan and abandoning the use of the site as a landfill.

The ZHB stated the issue of whether the transfer station was operating under proper authority was not before it. While the transfer station has a DEP permit to operate at the site, it has no approval from the ZHB to operate in the R–1 district. Because the issue of the transfer station's compliance with the zoning ordinance was not before the ZHB, the ZHB declined to make any findings regarding the transfer station. However, as to the proposed landfill, the ZHB stated, it would appear the proper remedy, if there is one, is for Tri–County to seek a rezoning of its property from R–1 Residential Rural to I–Industrial for the 500 acres owned by Tri–County and the Vogel family and/or its related entities.

Also, distinguishing cases relied on by Tri–County,[3] the ZHB explained that the change in use on the property in 1990 from a landfill to a transfer station, evidenced abandonment. The ZHB further explained there are significant differences between a transfer station and a landfill operation, including the fact that the transfer station as it exists today at the Tri–County site is operated within an enclosed building and, therefore, would not generate the adverse effects that accompany a landfill. The ZHB explained the proposed landfill is significantly different in operation and scope than a transfer station as it relates to its impact in a R–1 district.

The ZHB also rejected Tri–County's reliance on the doctrine of natural expansion of a non-conforming use, stating, not only was the landfill abandoned, a transfer station was built in its place. The ZHB stated the only waste disposal area that was "grandfathered in" was the "old" 19.2–acre area. ZHB Mem. Op. at 15. Any expansion of the non-conforming use beyond the 19.2 acres of waste disposal area required ZHB approval, which Tri–County did not seek or obtain. Also, the addition of other

**3.** *See Latrobe Speedway, Inc. v. Zoning Hearing Bd. of Unity Twp.,* 553 Pa. 583, 720 A.2d 127 (1998); *Chartiers Twp. v. William H. Martin, Inc.,* 518 Pa. 181, 542 A.2d 985 (1988).

uses such as the transfer station was prohibited under the zoning ordinance's nonconforming use regulations.

## Use Variance

Further, the ZHB determined Tri-County could not meet its burden to obtain a use variance to allow its proposed landfill in the R-1 district. Specifically, the ZHB stated Tri-County did not prove any of the criteria for a use variance.

## De Facto Exclusion of Landfills by Application of Height Restriction

The ZHB also considered and rejected Tri-County's assertion that the zoning ordinance created an unconstitutional *de facto* exclusion of landfills. The ZHB explained there are several designated industrial sites in the Township, and at least one of these areas could be used for a landfill. Based on the record before it, the ZHB stated, it could not make a finding that there was no other site available in an industrial zone that could be used—thus causing a *de facto* restriction on landfills.

Although deeming it unnecessary to its decision based on the above determinations, the ZHB nevertheless analyzed the issue of the 40-foot height restriction on structures, and whether a landfill does, in fact, constitute a structure.

Based on the broad definitions of "structure" found in the zoning ordinance and in dictionaries, the ZHB determined a modern landfill is, in fact, a structure. To that end, the ZHB explained a modern landfill is not simply a dump or a pile of dirt, slag, gravel or anything of that nature. Rather, a modern landfill is a highly sophisticated, highly engineered structure.

Because the proposed, modern landfill constituted a "structure," the ZHB determined Tri-County's proposed landfill was subject to the zoning ordinance's 40-foot height limitation. Further, the ZHB found Tri-County did not meet its burden of proving entitlement to a dimensional variance from the 40-foot height restriction. To that end, Objectors presented testimony that, with different compaction rates available in the industry, a viable landfill could be constructed in compliance with the 40-foot height restriction. Thus, the ZHB determined Tri-County did not prove the 40-foot height restriction would prevent it from being economically viable; therefore, there was no basis upon which to grant Tri-County relief from that restriction.

## Laches and Estoppel

Finally, the ZHB rejected Tri-County's arguments premised upon laches and estoppel. To that end, the ZHB stated, while there may be an issue of laches and estoppel concerning the transfer station and its operation over the past 21 years, the same reasoning could not apply to the landfill, which has not operated since 1990.

Based on these determinations, the ZHB: (1) denied Tri-County's appeal from the zoning officer's denial of a certificate of use and occupancy for a landfill; (2) denied Tri-County's request for a use variance; (3) denied Tri-County's request for a dimensional variance from the zoning ordinance's 40-foot height restriction; (4) determined the zoning ordinance did not create a *de facto* exclusion of landfills; and, (5) rejected Tri-County's reliance on the equitable theories of variance by estoppel and laches. Tri-County appealed to the trial court.

## Trial Court

Without taking additional evidence, the trial court denied Tri-County's appeal and affirmed the ZHB's decision. However, the trial court disagreed with the ZHB's

determinations on some of the issues raised.

Specifically, the trial court considered Tri–County's repeated permit applications to DEP, and it determined the ZHB erred in determining Tri–County abandoned its prior non-conforming landfill use. The trial court also determined the ZHB erred in determining the doctrine of natural expansion was inapplicable.

Nevertheless, the trial court agreed with the ZHB that the proposed landfill was a "structure" as defined by the zoning ordinance; therefore, it was subject to the 40–foot height restriction. Further, the trial court determined the ZHB properly rejected Tri–County's request for a dimensional variance from the 40–foot height restriction where testimony before the ZHB revealed Tri–County could construct a viable landfill within the 40–feet height restriction. Finally, the trial court rejected Tri–County's argument that the zoning ordinance's 40–foot height limitation effected a *de facto* exclusion of landfills based on the ZHB's acceptance of testimony that a landfill could be economically viable on Tri–County's property with the 40–foot height restriction. Tri–County appealed to this Court.

## II. Issues

On appeal,[4] Tri–County argues it owns a landfill site that has been permitted and used for active waste disposal since the 1940s. It contends that no party appealed the propriety of the trial court's determination that the nonconforming status of the landfill use continues and was never abandoned.

Tri–County maintains that, after properly concluding the landfill is a nonconform-ing use, the trial court considered whether the landfill fell within the zoning ordinance's definition of "structure" and thus whether a landfill could be subject to the zoning ordinance's 40–foot height restriction. Without citing its full text, Tri–County asserts, the trial court found the definition was "unambiguous" and that a landfill is a "structure." The definition contains general terms describing a "structure" and a list of examples, which does not include "landfill." In referring only to the definition's general terms, Tri–County contends, the trial court ignored the enumerated items and failed to recognize the ambiguity—that the definition may—or may not be—read to encompass a landfill. Because it did not recognize the inherent doubt in the zoning ordinance's intended meaning, Tri–County argues, the trial court failed to comply with the MPC's mandate that, where doubt exists, the language must be interpreted to favor a broader use of land—and against any implied restriction. Tri–County asserts the trial court also failed to consider the relevant rules of statutory construction, which confirm that "structure" cannot be construed to include landfills.

Further, Tri–County argues the trial court failed to address the substantial evidence demonstrating that imposing a height restriction has the unconstitutional effect of excluding the landfill use. Tri–County contends an economically viable landfill simply cannot be developed anywhere in the Township subject to a 40–foot height restriction.

Tri–County further maintains the trial court disregarded the law and evidence

---

4. Because the parties presented no additional evidence after the ZHB's decision, our review is limited to determining whether the ZHB committed an abuse of discretion or an error of law. *Taliaferro v. Darby Twp. Zoning Hearing Bd.,* 873 A.2d 807 (Pa.Cmwlth.2005). The ZHB is the fact-finder here. *Id.*

that would support the grant of a variance or other equitable relief.

Objectors respond that Tri–County requires approvals from the ZHB to place its proposed landfill in the R–1 Residential Rural zoning district and to construct the landfill to a height of 140 feet. Objectors assert the ZHB denied Tri–County all of its requested approvals for a landfill use at its proposed site. Those decisions were based on detailed findings of fact, which were supported by substantial evidence, and reflected reasonable interpretations of law.

Objectors argue a landfill is not a valid nonconforming use because no landfill has been lawful at the site for more than 22 years. Objectors contend Tri–County Industries abandoned the former landfill in 1990 when it agreed to close and actually closed that facility, and Tri–County Industries replaced the former use by constructing and operating a transfer station. Objectors maintain the proposed landfill would be a larger, more intensive use than any before at the site and would be incompatible with the R–1 district and a neighboring commercial development anchored by a retail outlet center.

Further, Objectors assert Tri–County is not entitled to a use variance or to a variance by estoppel or laches, as substantial evidence supports the ZHB's conclusions that Tri–County failed to meet its burden for any such relief. Objectors argue the zoning ordinance does not unlawfully exclude landfills, expressly permitting them in industrial zones. Objectors also argue that landfills are permitted at multiple sites across the "Wolf Creek Council of Governments Multi–Municipal Plan" (Wolf Creek MMP) area, a multi-municipal comprehensive plan applicable to the area of Pine, Liberty, Springfield, and Wolf Creek Townships, and the Borough of Grove City.

Further, Objectors argue, even if Tri–County was entitled to some landfill use at the site, it cannot build the proposed landfill to 140 feet because the landfill would constitute a "structure" as defined by the zoning ordinance. Objectors contend the proposed landfill clearly, as a matter of fact, falls within the zoning ordinance's definition of "structure." Even if the definition of "structure" were ambiguous, Objectors argue, the ZHB's interpretation is both reasonable and fact-based, and neither the MPC nor the rules of statutory construction compel this Court to reverse the ZHB's interpretation.

In addition, Objectors assert, the ZHB's interpretation does not result in a constitutional exclusion of landfills, because: (a) Tri–County did not show that no landfill could be profitable at a height of 40 feet; (b) credible evidence showed Tri–County's calculations of the viability of a 40–foot landfill at its site relied on improper assumptions; and, (c) landfills are permitted elsewhere in the Wolf Creek MMP region.

For the same reasons, Objectors maintain, Tri–County is not entitled to a dimensional variance from the 40–foot height restriction that applies even if Tri–County obtains approval for a landfill use. Objectors assert Tri–County raises many of the same arguments that failed before the ZHB and in the trial court. Its arguments lack merit, ignore the ZHB's findings and conclusions and the record below, and there is no basis for this Court to grant Tri–County's appeal.

Individual Objectors[5] submitted a separate brief in which they argue that in a letter from DEP to Tri–County, DEP stat-

5. Individual Objectors are Dr. Ray Yourd, Diana Hardisky, Eric and Polly Lindh, Bill and Lisa Pritchard, Anne and Dave Dayton, and Doug Bashline.

ed that when the landfill operated in the 1980s, DEP's files revealed a history of violations. Supplemental Reproduced Record (S.R.R.) at 25c. More recently, DEP cited another company owned by the same parent company, Seneca Landfill, for violations at a landfill it owns and operates in Butler County. Individual Objectors assert that a review of the compliance history for Seneca Landfill shows the company could not operate consistently, without violations, over the past five years. Individual Objectors further contend DEP determined Tri–County could not obtain 100% compliance with its proposed "Bird Control Plan." S.R.R. at 25c.

To that end, Individual Objectors argue the Federal Aviation Administration (FAA) documented approximately 450 bird/aircraft collisions at the Atlantic City Airport since 1990 where Dr. Rolf Davis, consultant for Tri–County, who wrote the bird control plan for the proposed landfill, was the bird control specialist. The Atlantic City landfill implemented a bird control plan that Dr. Davis prepared, and it is the same plan proposed for the Tri–County landfill. S.R.R. at 26c.

Individual Objectors further assert that, in a letter dated October 4, 2001, DEP advised Tri–County that the presence of birds was a legitimate safety concern particularly during approach and departure from an airport runway, the periods when aircraft are most vulnerable to bird strikes. S.R.R. at 34c, 45c–47c. The FAA considers landfills within 5,000 feet for a piston powered aircraft and 10,000 feet for turbine powered aircraft to be incompatible with airport operations. S.R.R. at 35c. Here, the proposed landfill is located within close proximity to the Grove City Airport, rendering it an unsuitable location under state and federal law.

In its reply brief, Tri–County first argues that, because the trial court ruled against Objectors on the non-conforming

use and site suitability issues, Objectors cannot pretend to have "prevailed" on these issues. Appellant's Reply Br. at 9. Tri–County contends that, under the Rules of Appellate Procedure, because Objectors did not file a timely cross-appeal, the trial court's ruling on the non-conforming use issues is final.

Further, Tri–County asserts, the trial court properly determined the non-conforming use status of a landfill on Tri–County's property and identified the ZHB's legal errors in finding abandonment of the landfill use. To that end, Tri–County maintains, it presented substantial evidence of the existence and intent to continue the landfill use on its property. Therefore, Tri–County argues, the trial court properly determined Tri–County did not abandon its prior landfill use.

Tri–County also maintains it is entitled to site-specific relief because of the zoning ordinance's *de facto* exclusion of landfills. Further, Tri–County contends, because Objectors did not appeal the landfill's non-conforming use status, it was not necessary for Tri–County to pursue its exclusionary challenge and right to site-specific relief. Nevertheless, Tri–County asserts, it is equally entitled to use its property as a landfill as site-specific relief. Nevertheless, Tri–County asserts, it is equally entitled to use its property as a landfill as site-specific relief for the zoning ordinance's total exclusion of landfills. Tri–County argues it presented substantial evidence that no viable landfill could be located in any of the Township's industrial zoning districts. It further maintains the ZHB did not make a single finding and did not consider controlling law in rejecting Tri–County's exclusionary challenge.

### III. Discussion

### A. Objectors' Failure to Cross–Appeal

Initially, as a threshold procedural matter, the parties disagree over whether Ob-

jectors were required to file a cross-appeal from the trial court's order to allow Objectors to challenge the trial court's determinations that Tri–County neither abandoned nor unlawfully expanded its prior non-conforming landfill use.

After Tri–County filed its appeal to this Court, it filed a motion to quash and/or strike before this Court, seeking to preclude Objectors from raising issues beyond those raised by Tri–County in its appeal because Objectors did not file a cross-appeal from the trial court's decision. Specifically, Tri–County sought to bar Objectors from challenging the trial court's determinations that Tri–County did not abandon or unlawfully expand its prior, non-conforming landfill use and to strike those portions of Objectors' brief that raised such challenges. Tri–County also sought to preclude Objectors from challenging the suitability of the landfill on the landfill site by quashing any such challenges and striking Individual Objectors' brief in its entirety.

Ultimately, a single judge of this Court granted Tri–County's motion to quash and/or strike, stating (with emphasis added):

> The issues in this appeal shall be limited to those issues raised in [Tri-County's] brief, that is, whether the ordinance's definition of structure can be read to encompass landfills; whether the trial court erred in failing to address the unconstitutional and exclusionary effect of the 40–foot height limitation; and whether the trial court failed to require the appropriate variances. To the extent [Objectors] seek to raise issues beyond those raised by [Tri–County], said issues are surplusage and are a collateral attack on the underlying trial court order.

Commonwealth Court Order of 9/4/13 (Quigley, S.J.). Objectors then filed an application for reconsideration, which the same single judge denied.

With regard to the effect of a single-judge order, in *Great Valley School District v. Zoning Hearing Board of East Whiteland Township,* 863 A.2d 74, 80–81 (Pa.Cmwlth.2004) this Court previously explained (with emphasis added):

> Pursuant to Pa. R.A.P. 123(e), a single judge of this Court may grant or deny any request for relief which under the rules may properly be sought by application. *The action of a single judge may be reviewed by the full court.* Pa. R.A.P. 123(e). A party may seek review of the decision of a single judge by requesting reconsideration *by the full court* pursuant to Pa. R.A.P. 2541–2547 *instead of later when the full court considers the merits of the appeal thereby avoiding the 'law of the case doctrine.'* *Larocca v. Workmen's Compensation Appeal Board (the Pittsburgh Press),* 140 Pa.Cmwlth. 192, 592 A.2d 757, *petition for allowance of appeal denied,* 529 Pa. 659, 604 A.2d 251 (1991). 'This doctrine has traditionally been used where a court has ruled on a question, that same court will normally not reverse that determination upon consideration of another phase of the case.' *Smiths Implements, Inc. v. Workmen's Compensation Appeal Board (Leonard),* 673 A.2d 1039, 1042 (Pa.Cmwlth.1996) (citing *Hughes v. Pennsylvania State Police,* 152 Pa.Cmwlth. 409, 619 A.2d 390, 392 n. 1 (1992), *petition for allowance of appeal denied,* 536 Pa. 633, 637 A.2d 293 (1993)). When no petition for reconsideration from an order of a single judge is filed, that order is binding unless palpably erroneous. *Curley v. Board of School Directors of the Greater Johnstown School District,* 163 Pa.Cmwlth. 648, 641 A.2d 719 (1994).

■ Here, after the single-judge order granting Tri–County's motion to quash and/or strike, which precluded Objectors from challenging the trial court's determinations that Tri–County neither abandoned nor unlawfully expanded its prior non-conforming landfill use, Objectors filed an "an application for reconsideration by *the merits panel,* and in the alternative, for reargument before *the merits panel." See* Objectors' Application for Reconsideration by the Merits Panel, and in the alternative, for Reargument Before the Merits Panel, filed 9/20/13 (emphasis added). However, Objectors' application for reconsideration was not clearly directed to the full court. Indeed, that application was submitted to and acted upon by the same single judge that granted Tri–County's motion to quash and/or strike rather than submitted to the full court.[6] Under these circumstances, the single judge order granting Tri–County's motion to quash and/or strike is binding, *Great Valley School District,* thereby limiting the issues in this appeal to those raised in Tri–County's brief. Thus, it is improper for Objectors to once again seek review of issues beyond those raised by Tri–County before the merits panel. *See* 20 G. Ronald Darlington et al. Pennsylvania Appellate Practice § 123:20 (2012–2013 ed.) (counsel seeking review of an action on an application by a single judge in an appellate jurisdiction matter should seek reargument or reconsideration *by the entire appellate court* pursuant to Pa. R.A.P. 2541 to 2547 instead of later seeking review of the single judge's action at the time the court considers the merits of the appeal; this practice may avoid application of the "law of the case" doctrine).

■ More importantly, regardless of the procedural nuances, we would reach the same result on the merits. To that end, before the ZHB, Tri–County challenged the zoning officer's denial of a certificate of use and occupancy for its claimed pre-existing non-conforming landfill use. Reproduced Record (R.R.) at 565a–66a. The ZHB upheld the zoning officer's determination on the grounds that Tri–County abandoned its prior non-conforming landfill use and the doctrine of natural expansion was inapplicable. However, the trial court reversed the ZHB's denial of Tri–County's request for relief in this regard. Essentially, the trial court determined Tri–County had a right to its prior non-conforming landfill use, but the proposed landfill was subject to the 40–foot height restriction, and Tri–County was not entitled to relief from that restriction. While Tri–County appealed the trial court's denial of its requests for relief from the 40–foot height restriction, Objectors did *not* appeal the trial court's grant of relief on Tri–County's request for recognition of its non-conforming right to operate the landfill. As a result, no error is apparent in the single-judge order precluding Objectors from raising issues beyond those raised by Tri–County in its appeal.

■ Further, the *Note* to Pennsylvania Rule of Appellate Procedure 511 (relating to cross appeals) explains that an appellee should not be required to file a cross appeal where the court below has ruled against it on an issue, as long as the judgment granted the appellee the relief that it sought. Here, however, the trial court did not merely rule against Objectors on an issue while ultimately granting Objectors the relief they sought. Rather,

---

6. Section 291 of this Court's Internal Operating Procedures provides: "Where a party files a petition for reargument of an order issued by a single judge, the prothonotary shall submit the petition, together with any answer, to that judge for disposition." 210 Pa.Code § 69.291. Thus, as a practical matter, the single judge who issued the order to be reconsidered determines if the court *en banc* should review it.

the trial court specifically granted Tri–County part of the relief it requested when it determined the ZHB erred in failing to recognize that Tri–County had a non-conforming right to its landfill use. Thus, Objectors were aggrieved by that order. *Epstein v. Saul Ewing LLP*, 7 A.3d 303 (Pa.Super.2010) (a party is aggrieved by a ruling when that party has been adversely affected by the decision from which the appeal is taken; a prevailing party is not aggrieved and therefore, lacks standing to appeal an order that has been entered in his favor); see Pa. R.A.P. 501, *Note* (whether or not a party is aggrieved by the action below is a substantive question determined by the effect of the action on the party, etc.). Objectors' failure to appeal the trial court's order, which granted some of the relief sought by Tri–County, precludes them from raising issues beyond those raised by Tri–County. *See, e.g., Zarger's Plumbing & Heating v. Workers' Comp. Appeal Bd. (McGonical)*, 2009 WL 9096563 (Pa.Cmwlth., No. 1091 C.D.2009, filed November 16, 2009) (unreported) (Simpson, J.) (where employer appealed Workers' Compensation Appeal Board order granting benefits for claimant's left knee injury, but claimant did not appeal that part of Board order that reversed Workers' Compensation Judge's recognition of right knee injury, any consideration of right knee injury was waived) (citing *Sateach v. Beaver Meadows Zoning Hearing Bd. of Appeals*, 676 A.2d 747 (Pa. Cmwlth.1996) (where zoning board did not appeal common pleas court's reversal of its decision as to one of several charged zoning violations, it was precluded from challenging that aspect of trial court's order on appeal)); cf. *Borough of St. Lawrence v. Zoning Hearing Bd. of Borough of St. Lawrence*, 40 A.3d 764 (Pa.Cmwlth., Nos. 119, 218 C.D.2011, filed March 21, 2012) (unreported) (involving consolidated appeals with one party challenging determination that use constituted pre-existing, non-conforming use and another party challenging imposition of conditions on that use).

## B. Whether a Landfill is a "Structure" Under the Zoning Ordinance

■ As in the related case of *Tri–County Landfill, Inc. v. Liberty Township Board of Supervisors*, the central issue raised by Tri–County in its appeal is whether the ZHB and the trial court erred in determining the proposed landfill is a "structure" as defined by the zoning ordinance, rendering it subject to the 40–foot height restriction.

■ Like statutes, the primary objective of interpreting ordinances is to determine the intent of the legislative body that enacted the ordinance. *See* 1 Pa.C.S. § 1921; *Bailey v. Zoning Bd. of Adjustment of City of Phila.*, 569 Pa. 147, 801 A.2d 492 (2002); *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.*, 918 A.2d 171 (Pa.Cmwlth.2007) (en banc), aff'd, 601 Pa. 449, 974 A.2d 1144 (2009). In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. *Id.* Thus, statutory construction begins with examination of the text itself. *Id.*

In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903(a). Further, every statute shall be construed, if possible, to give effect to all its provisions so that no provision is "mere surplusage." 1 Pa.C.S. § 1921(a). Where the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921.

Thus, if we determine the ordinance provision at issue is unambiguous, we must apply it directly as written. *Bowman v. Sunoco, Inc.,* —— Pa. ——, 65 A.3d 901 (2013); *see* 1 Pa.C.S. § 1921(b). However, if we deem the language of the ordinance ambiguous, we must then ascertain the legislative body's intent by statutory analysis, wherein we may consider numerous relevant factors. *Id.* An ambiguity exists when language is subject to two or more reasonable interpretations and not merely because two conflicting interpretations may be suggested. *Adams Outdoor Adver., L.P. v. Zoning Hearing Bd. of Smithfield Twp.,* 909 A.2d 469 (Pa.Cmwlth. 2006).

Further, "[w]hile it is true that zoning ordinances are to be liberally construed to allow the broadest possible use of land, it is also true that zoning ordinances are to be construed in accordance with the plain and ordinary meaning of their words." *Zappala Grp., Inc. v. Zoning Hearing Bd. of Town of McCandless,* 810 A.2d 708, 710 (Pa.Cmwlth.2002). In addition,

> a zoning hearing board is the entity charged with the interpretation and application of the zoning ordinance. It is well settled that a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference from a reviewing court. This principle is also codified in Section 1921(c)(8) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(c)(8). The basis for the judicial deference is the knowledge and expertise that a zoning hearing board possesses to interpret the ordinance that it is charged with administering.

*Smith v. Zoning Hearing Bd. of Huntingdon Borough,* 734 A.2d 55, 57–58 (Pa. Cmwlth.1999) (citations and footnote omitted).

Section 2201 of the zoning ordinance defines the term "structure" as: *"A combination of materials forming a construction for occupancy and/or use including among other[s],* a building, stadium, gospel tent, circus tent, reviewing stand, platform, staging, observation tower, radio tower, water tank, trestle, pier, wharf, open shed, coal bin, shelter, fence, wall and a sign." R.R. at 1358a (emphasis added).

Of further note, Section 107 of the MPC defines a "structure" as "any man-made object having an ascertainable stationary location on or in land or water, whether or not affixed to the land." 53 P.S. § 10107.

In resolving the issue of whether the proposed landfill constitutes a "structure" as defined by the zoning ordinance, the ZHB explained that a modern landfill such as that proposed here, is not simply a dump or a pile of dirt, slag, gravel or anything similar. Rather, a modern landfill is a highly sophisticated, highly engineered structure consisting of, among other things: (1) a smooth soil bed; (2) a nonwoven geotextile fabric liner; (3) a thick, high density polyethylene (HDPE) liner; (4) a secondary liner; (5) two layers of drainage net between the two liners; (6) another layer of non-woven geotextile fabric; and, (7) 18 inches of stone. Incorporated within the liner system is a leachate collection system, including at the lowest level, a sump pump, which pumps the leachate into a storage tank. In addition to all these systems, there is a landfill gas extraction system constructed within the landfill. F.F. Nos. 79–82; R.R. at 3a–31a, 172a, 358a–59a, 607a–11a, 617a–629a.

Further, the trial court explained:

> The Court finds that the [p]roposed [l]andfill is a constructed object that has an ascertainable location. [Tri–County's] [p]roposed [l]andfill would consist of many acres and it will not be all

constructed at one time. The [p]roposed [l]andfill will be constructed in cells. In order to construct these cells, a double liner system is first constructed. Rolls of a high-density polyethylene are then laid out adjacent to each other on top of a geosynthetic sub-base. These rolls are then welded together and waste is then placed on top of these liners until it reaches its final grade. Once this final grade has been met, the waste is capped with a plastic liner to keep the waste full[y] encapsulated from the top to the bottom. Included in this fully encapsulated waste are many objects that are built into the final product. These objects include: pumps, sumps, pipes, wells, vacuums, and blower that all help prevent the landfill from contaminating the surrounding area.

The Court finds that the fact the waste inside the landfill uses the ground for support is irrelevant. The waste inside the [p]roposed [l]andfill is not what converts the [l]andfill into a 'structure.' The [p]roposed [l]andfill is a structure because it is a combination of material that is constructed to contain the waste. The [zoning] [o]rdinance's definition of 'structure' only requires that the object be a construction for some type of use. The Court finds, therefore that the proposed [l]andfill is a 'structure' under the [z]oning [o]rdinance.

Tr. Ct., Slip Op., 1/15/13, at 12.

Based on the plain language of the definition of "structure," found in Section 2201 of the zoning ordinance, and the facts found by the ZHB regarding the proposed landfill, we discern no error in the above-determinations that the proposed modern landfill constitutes a "structure." More particularly, based on the above determinations regarding the construction and composition of the proposed modern landfill, it clearly qualifies as "[a] combination of materials forming a construction [7] for occupancy and/or use."

Nevertheless, Tri–County argues, the use of the language "including" preceding the list of enumerated examples of structures in the definition, coupled with the absence of a specific mention of "landfills," renders the definition ambiguous.

Contrary to Tri–County's assertions, the zoning ordinance's definition of a structure is not ambiguous. As explained above, based on the ZHB's determinations regarding the components and composition of the proposed landfill, we agree with the trial court that the proposed landfill falls within this unambiguous plain language.

 Further, Tri–County's argument neglects the fact that the term "including" in the zoning ordinance's definition of a "structure" is followed by the words "among other[s]." Id. As our Supreme Court explains,

> the term 'include' is 'to be dealt with as a word of enlargement and not limitation' … this [is] 'especially true' when followed by the phrase 'but not limited to.' … *[T]he introductory verbiage 'including, but not limited to,' generally reflects the intent of the legislature to broaden the reach of a statute, rather than a purpose to limit the scope of the law to those matters enumerated therein.*

---

**7.** Black's Law Dictionary defines "construction," in relevant part as, "[t]he act of building by combining or arranging parts or elements; the thing so built." BLACK'S LAW DICTIONARY 332 (8th ed. 2004); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 248 (10th ed. 2001) ("the process, art, or manner of constructing something; *also:* a thing constructed").

*Dechert, LLP v. Commonwealth,* 606 Pa. 334, 343, 998 A.2d 575, 580–81 (2010) (quoting *Pennsylvania Human Relations Comm'n v. Alto–Reste Park Cemetery Ass'n,* 453 Pa. 124, 130–31, 306 A.2d 881, 885 (1973)) (emphasis added). Indeed, in *Aldine Apartments, Inc. v. Commonwealth,* 39 Pa.Cmwlth. 204, 395 A.2d 299, 302 (1978), which our Supreme Court cited approvingly in *Dechert,* this Court stated, *"the statutory language 'including, but not limited to' ... is a clear indication that the Legislature intended to exclude nothing, implicitly or otherwise, by the language which follows those words."* (Emphasis added.); *see also Commonwealth v. Conklin,* 587 Pa. 140, 156, 897 A.2d 1168, 1176 n. 16 (2006) (noting that, in the psychology practice act, exceptions set forth following the language "including but not limited to" are illustrative and not exhaustive).

██ Here, the fact that Section 2201 of the zoning ordinance contains a non-exhaustive list of examples of structures, which does not specifically include landfills, does not render it ambiguous. Rather, like the phrase "including, but not limited to," the use of the phrase "including among other[s]," generally evidences a legislative intent to broaden the reach of the ordinance, "rather than a purpose to limit the scope of the law to those matters enumerated therein." *Dechert,* 606 Pa. at 343, 998 A.2d at 581.

Further, in *Dechert,* our Supreme Court rejected an argument similar to that presented by Tri–County here. Specifically, in *Dechert,* the Court rejected an argument that a statute was "automatically" ambiguous and, therefore, should be construed in a taxpayer's favor where it used the phrase "including but not limited" followed by several enumerated examples, which did not include the specific item

subject to taxation. *Id.* at 344–45, 998 A.2d at 582. ("[T]he fact that the General Assembly did not specifically list canned computer software in its definition of tangible personal property ... does not automatically render the statute ambiguous.")

Moreover, *McClellan v. Health Maintenance Organization of Pennsylvania,* 546 Pa. 463, 686 A.2d 801 (1996), a decision of an evenly-divided Supreme Court on which Tri–County relies, does not compel a different result. There, the Court was asked whether a health maintenance organization (HMO) organized under the individual practice association (IPA) structural model pursuant to former Pennsylvania regulations, could be considered a "professional health care provider" under Section 2 of the Peer Review Protection Act (Peer Review Act),[8] which defined that term as follows:

> 'Professional health care provider' means individuals or organizations who are approved, licensed, or otherwise regulated to practice or operate in the health care field under the law of the Commonwealth, *including, but not limited to,* the following individuals or organizations:
>
> (1) A physician.
>
> (2) A dentist.
>
> (3) A podiatrist.
>
> (4) A chiropractor.
>
> (5) An optometrist.
>
> (6) A psychologist.
>
> (7) A pharmacist.
>
> (8) A registered or practical nurse.
>
> (9) A physical therapist.
>
> (10) An administrator of a hospital, a nursing or convalescent home, or other health care facility.

8. Act of July 20, 1974, P.L. 564, No. 193, *as amended,* 63 P.S. § 425.2.

*(11) A corporation or other organization operating a hospital, a nursing or convalescent home or other health care facility.*

*McClellan,* 546 Pa. at 470–71, 686 A.2d at 804–05 (quoting 63 P.S. § 425.2) (emphasis in original).

A divided Court stated that while the definition of "professional health care provider" did not specifically include an entity such as an IPA model HMO, its terms were broad enough that "we may or may not read the [Peer Review] Act as explicitly excluding such organizations. The words of the [Peer Review] Act defining 'health care provider,' then, are ambiguous." *Id.* at 471, 686 A.2d at 805. The divided Court further stated: "It is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples." *Id.* at 472, 686 A.2d at 805 (citing decisions of the New Hampshire Supreme Court and the Massachusetts Court of Appeals). The Court then recited the doctrine of *ejusdem generis,* stating that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. Further, where the opposite sequence is found, specific words following general ones, the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated. *Id.*

Applying those principles to its interpretation of Section 2 of the Peer Review Act, the Court stated that of the eleven listed terms included in the statute's definition of professional health care provider, nine are titles of individual health care workers.

The remaining two are an administrator, and a corporation or other organization operating or administering a hospital, a nursing or convalescent home or other health care facility. Thus, the list of health care providers in Section 2 of the Peer Review Act included only (1) immediate or direct health care practitioners, and (2) administrators of medical facilities, be they individuals or organizations. Ultimately, the Court concluded the HMO was neither a direct or immediate health care provider nor an administrator of a medical facility.

We reject Tri–County's reliance on *McClellan* for several reasons. First, *McClellan,* which was the product of an evenly divided Court, lacks precedential value. *See Commonwealth v. Baldwin,* 604 Pa. 34, 985 A.2d 830 (2009) (observing that a plurality decision of the Supreme Court has no precedential weight); *Weiley v. Albert Einstein Med. Ctr.,* 51 A.3d 202 (Pa.Super.2012) (where the Supreme Court is divided evenly, its opinion lacks precedential value, although it has persuasive value).

Next, unlike in *McClellan,* where the statutory provision at issue identified specific individuals or entities, which essentially fell within two readily definable categories, following the "including, but not limited to" language, here the enumerated examples that follow the "including among other[s]" language in the zoning ordinance's definition of a "structure" cannot be distilled into distinct categories like the direct health care practitioners and administrators of medical facilities. Rather, the list of enumerated examples is varied ("a building, stadium, gospel tent, circus tent, reviewing stand, platform, staging, observation tower, radio tower, water tank, trestle, pier, wharf, open shed, coal bin, shelter, fence, wall and a sign"), suggesting a broader reading is appropriate.

Finally, and more importantly, as noted above, in a 2010 decision, 14 years after the plurality opinion in *McClellan,* our Supreme Court rejected arguments similar to those presented by Tri–County here, specifically stating that the introductory verbiage "including, but not limited to," generally reflects the intent of the legislature to broaden the reach of a statute, rather than a purpose to limit the scope of the law to those matters enumerated therein.[9]

 Relying on the doctrines of *ejusdem generis* or *noscitur a sociis,*[10] Tri–County also argues that we must look to what it alleges are the common characteristics of the enumerated examples in the zoning ordinance's "structure" definition. To that end, Tri–County asserts the enumerated examples all have an ascertain-

able stationary location, on a limited construction site, and a structural element that is affixed to the ground or man-made materials designed to provide engineering support. Further, each enumerated item could be razed and removed from the site on which it is constructed, leaving the ground behind generally as it existed before the structure was built. This argument fails for several reasons.

First, Tri–County's arguments regarding the asserted common criteria among the enumerated examples appear to be an attempt to craft a new definition of the term "structure." Indeed, Tri–County's alleged criteria are not consistent with the broader definition of the term "structure" that precedes the enumerated examples contained in the zoning ordinance.

9. We also reject Tri–County's reliance (in a footnote) on this Court's decision in *Department of Environmental Protection v. Cumberland Coal Resources, L.P.,* 29 A.3d 414 (Pa. Cmwlth.2011) (*en banc*), *appeal granted,* —— Pa. ——, 63 A.3d 252 (2013), in which we found an ambiguity in the definition of the term "accident" in Section 104 of the Bituminous Coal Mine Safety Act, Act of July 7, 2008, P.L. 654, 52 P.S. § 690–104. That statutory provision defines an accident is "[a]n unanticipated event, *including any of the following* ..." preceding a list of events. *Id.* at 423. In determining this language was ambiguous, we explained:

> DEP asserts that the key language in the definition is '[a]n unanticipated event.' DEP contends that this language reflects a legislative judgment that the list is not exhaustive. Also, the General Assembly used the word 'including,' which maybe interpreted 'as a word of enlargement or of illustrative application. Black's Law Dictionary 763 (6th ed. 1990); *see Velocity [Express v. Pa. Human Relations Commission,* 853 A.2d 1182, 1186 (Pa.Cmwlth. 2004)] (holding that General Assembly's use of word 'includes' before specific list meant list plus others of 'same general kind or class'). *The definition, however, also uses the word 'any' to modify the list of identified events the General Assembly included in the definition of the term 'acci-*

> *dent.' The General Assembly's use of the word 'any' suggests that the General Assembly might have intended that the list is exclusive.* Both interpretations are reasonable, and, consequently, we conclude that the provision is ambiguous.

*Id.* at 423–24 (emphasis added).

Unlike the statutory definition at issue in *Cumberland Coal Resources,* which utilized the phrase "including any of the following" preceding a list of events making it unclear whether the list was exhaustive or illustrative, here the zoning ordinance's definition of the term "structure" uses the phrase "including among other[s]" preceding a list of various examples of structures. Section 301 of the zoning ordinance. As set forth above, our Supreme Court holds the introductory verbiage "including, but not limited to," generally reflects a legislative intent to broaden the reach of a statute, rather than a purpose to limit the scope of the law to those matters enumerated therein. *Dechert, LLP v. Commonwealth,* 606 Pa. 334, 998 A.2d 575 (2010).

10. "The ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.,* 4 A.3d 749, 756 n. 9 (Pa.Cmwlth.2010) (citation omitted).

In addition, Tri–County's asserted criteria do not even apply to all of the enumerated examples of structures in the zoning ordinance definition. For example, the definition includes a "wall" as a structure; however, under Tri–County's theory, a wall constructed of layers of stone piled on top of each other, where the bottom layer rests on the ground, would not be a "structure" because it is not "affixed to the ground or man-made materials that are designed to provide engineering support." Appellant's Br. at 41. Further, several of the "example" structures in the zoning ordinance definition are not necessarily affixed to the ground or man-made materials that are designed to provide engineering support, including a "coal bin," an "open shed," a "reviewing stand" and "a sign." R.R. at 1358a.

Finally, it appears that a landfill would, in fact, fall within the common characteristics between the enumerated examples alleged by Tri–County. Specifically: (1) a landfill has an ascertainable location; (2) a modern landfill has a man-made engineered liner foundation; and, (3) a landfill could be closed and/or removed. For all these reasons, we reject Tri–County's arguments premised on the doctrines of *ejusdem generis* or *noscitur a sociis.*

Tri–County also makes the convoluted argument that a different section of the zoning ordinance, Section 902.1(5), confirms that a landfill is not a structure because this section distinguishes among "buildings, other structures, [and] active landfilling areas in approved sanitary landfills." *Id.* Tri–County contends that if a landfill were unambiguously a structure under the zoning ordinance, there would be no need to reference "active landfilling areas in approved sanitary landfills" as distinct from "other structures." Thus, Tri–County argues, the only way to give meaning to Section 902.1(5) is to recognize

that a "landfill" is not an "other structure," and that buildings, "other structures" and landfills are distinct.

Section 902.1(5) of the zoning ordinance, which is set forth within the regulations governing the I Industrial zoning district, states:

Section 902: Development Regulations

902.1: Provisions of Use—Any permitted principal and/or accessory use shall be subject to the following use regulations:

\* \* \*

(5) Any part or portion of a lot developed for industrial uses which is not used for buildings, other structures, active landfilling areas in approved sanitary landfills, parking or loading spaces, or aisles, driveways, sidewalks, and designated storage areas shall be planted and maintained with grass or other all season ground cover vegetation. Grass shall be kept neatly mowed. Landscaping with trees and shrubs is permitted and encouraged.

*Id.;* R.R. at 1348a.

Contrary to Tri–County's assertions, it is not clear how the language of this provision, which requires maintenance of grass or vegetation on properties in industrial districts aside from those portions of properties used for buildings, other structures, or active landfilling areas, requires an interpretation of the term "structure" as excluding landfills from the clear definition of a "structure" in Section 2201. This provision has no bearing on the issue of whether a landfill is a structure under the definition provided in the zoning ordinance.

Moreover, Tri–County's interpretation of Section 902.1(5) is problematic because under Tri–County's reading "buildings" would not be considered "structures" because they are listed separately. Clearly,

this interpretation is flawed given that a "building" is specifically mentioned in Section 2201 of the zoning ordinance's definition of the term "structure." *Id.;* R.R. at 1358a.

Tri–County also argues the omission of a height limitation in Section 901.1(12) of the zoning ordinance (which sets forth permitted uses in the "I" Industrial zoning district as well as the criteria for conditional use approval for, among other uses, sanitary landfills) renders the definition of "structure" ambiguous. Contrary to Tri–County's contentions, the zoning ordinance is organized in such a manner that height restrictions are provided in a *separate section for each zoning district* rather than in the ordinance provisions that address the permitted uses for each zoning district. *See* Section 903.1 of the zoning ordinance (providing that "[n]o building shall exceed 40 feet in height" in the "I" Industrial zoning district.)

Further, while Tri–County points to the definition of "facility" set forth in the Solid Waste Management Act (SWMA)[11] and DEP regulations, neither the zoning ordinance nor the MPC cross-reference the SWMA or DEP regulations. More importantly, it is unclear how the fact that the SWMA and DEP regulations define a different term, *i.e.*, "facility," informs an interpretation of the zoning ordinance's express definition of the term "structure."

In addition, Tri–County invokes the principal that, where possible, an ordinance must be interpreted in a constitutional manner. To that end, Tri–County asserts that, under Pennsylvania law, the *de facto* exclusion of a legitimate land use is unconstitutional, and landfills are a use that a municipality cannot exclude. Where doubt as to the constitutionality of an ordinance is raised and a constitutional interpretation is possible, Tri–County contends, an ordinance must be interpreted to avoid the exclusion. As discussed below, Tri–County maintains, the imposition of a height restriction, through the contrivance of calling a "landfill" a "structure," has the unconstitutional effect of prohibiting landfills throughout the Township. Tri–County argues that an interpretation recognizing that the height restriction for "structures" does not apply to landfills is both reasonable and constitutional. Thus, it asserts, under the rules of construction, the zoning ordinance must be interpreted in that constitutional manner. We reject this argument.

Pursuant to Section 1922(3) of the Statutory Construction Act of 1972: "In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: ... (3) That the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth." 1 Pa.C.S. § 1922(3); *U. Salford Twp. v. Collins,* 542 Pa. 608, 610, 669 A.2d 335, 336 (1995) (*"Uncertainties in the interpretation of an ordinance* are to be resolved in favor of a construction which renders the ordinance constitutional.") (Emphasis added.) Here, however, the plain, unambiguous language of the zoning ordinance can be reasonably read to encompass landfills within its broad definition of "structures." Thus, it is unnecessary to resort to legislative intent here. *See, e.g., Mohamed v. Dep't of Transp., Bureau of Motor Vehicles,* 615 Pa. 6, 18, 40 A.3d 1186, 1193 (2012) ("In discerning [legislative] intent, the court first resorts to the language of the statute itself. If the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look

---

**11.** Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.

beyond the statutory language to ascertain its meaning. . . . Relatedly, it is well established that resort to the rules of statutory construction is to be made only when there is an ambiguity in the provision.") (Citation and quotations omitted.)

More importantly, as set forth below, application of the 40–foot height restriction does not result in a *de facto* exclusion of landfill use. Thus, Tri–County's argument fails.

For all these reasons, we conclude Tri–County's proposed, modern landfill falls within the unambiguous definition of "structure" found in Section 2201 of the zoning ordinance. Based on our determination that Section 2201 of the zoning ordinance is unambiguous, we reject Tri–County's argument premised on Section 603.1 of the MPC. That Section states:

In interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, *where doubt exists as to the intended meaning of the language written and enacted by the governing body,* in favor of the property owner and against any implied extension of the restriction.

53 P.S. § 10603.1 [12] (emphasis added).

■ "Of particular import here ... this rule of construction is inapplicable where ... the words of the zoning ordinance are clear and free from any ambiguity." *Adams Outdoor Adver.,* 909 A.2d at 484 (quoting *Isaacs v. Wilkes–Barre City Zoning Hearing Bd.,* 148 Pa.Cmwlth. 578, 612 A.2d 559, 561 (1992)); *see also City of Hope v. Sadsbury Twp. Zoning Hearing Bd.,* 890 A.2d 1137 (Pa.Cmwlth.2006); *Risker v. Smith Twp. Zoning Hearing Bd.,* 886 A.2d 727 (Pa.Cmwlth.2005). As explained above, we reject Tri–County's arguments that the language of Section 2201 of the zoning ordinance is ambiguous; therefore, this rule of construction is inapplicable here. *Id.*

## C. Alleged *De Facto* Exclusion of Landfills

Tri–County next argues the trial court erred in failing to address the unconstitutional and exclusionary effect of a 40–foot height limitation. It asserts the zoning ordinance permits landfills in its I Industrial districts, subject to the conditions of compliance with DEP regulations and the issuance of a DEP permit. Although neither the ZHB nor the trial court acknowledged it, Tri–County asserts, it presented substantial evidence that showed why it would be impossible to develop an economically viable and DEP-compliant landfill in any of the Township's I Industrial districts. It contends this Court recognizes that site-specific relief is appropriate where an ordinance's restrictions have the effect of excluding a legitimate use.

Tri–County maintains site-specific relief in the form of allowing use of its property for a landfill is appropriate. Yet, as Tri–County also demonstrated, site specific relief—or allowing use of the landfill site for the non-conforming landfill use—would be meaningless if a 40–foot height limitation were imposed. It asserts a 40–foot height limitation would have the effect of totally preventing the development of any economically viable landfill. Because the proposed landfill site is the only site in the Township where a landfill could be developed, Tri–County argues, the height limitation would prevent the development of a viable landfill anywhere in the Township.

As its engineer explained, the costs associated with a 40–foot landfill on the proposed landfill site would be $79 million and the potential revenue only $49 to $60 mil-

lion. Tri–County argues Objectors' engineer did not present his own analysis and could not credibly refute Tri–County's engineer's report. He conceded he was only able to project higher revenues by ignoring Tri–County's obligation to use 30% of the disposal area for the relocation of the old waste, by using an unrealistic revenue estimate, and by failing to include a rate of return on the operator's investment. His testimony could not contradict the clear evidence that a 40–foot height restriction would effectively prohibit a viable landfill.

Tri–County argues it demonstrated that its property is the only location in the Township where a landfill could be located, and no viable landfill could be developed on that site with a 40–foot height limitation. It asserts the trial court did not address this evidence or Tri–County's exclusionary challenge to an interpretation of the zoning ordinance that would impose that restriction. Tri–County contends the trial court's interpretation had the effect of imposing the height limitation and thus, of creating an unconstitutional exclusion. As such, it argues, the trial court's interpretation should be reversed.

 Zoning ordinances in Pennsylvania enjoy a presumption of constitutionality and validity, and the party challenging one bears a heavy burden of proving otherwise. *Interstate Outdoor Adver., L.P. v. Zoning Hearing Bd. of Warrington Twp.*, 39 A.3d 1019 (Pa.Cmwlth.2012). In order to overcome this presumption of constitutionality, a challenger must show the ordinance totally excludes an otherwise legitimate use. *Id.* Unless the challenger proves the ordinance in question completely or effectively excludes a legitimate use, the challenger cannot carry its burden. *Id.* To prove a total or effective exclusion of a permitted use, the challenger can show the ordinance is either *de jure* or *de facto* exclusionary. *Id.*

A *de jure* exclusion exists where an ordinance, on its face, totally bans a legitimate use. *Id.* A *de facto* exclusion exists where an ordinance permits a use on its face, but when applied, acts to prohibit the use throughout a municipality. *Id.*

 If a challenger is able to establish the ordinance excludes the use in question, the burden shifts to the municipality to show the zoning ordinance bears a substantial relationship to public health, safety and welfare. *Macioce v. Zoning Hearing Bd. of Borough of Baldwin*, 850 A.2d 882 (Pa.Cmwlth.2004).

 This Court may not substitute its interpretation of the evidence for that of the ZHB. *Taliaferro v. Darby Twp. Zoning Hearing Bd.*, 873 A.2d 807 (Pa. Cmwlth.2005). It is the function of a ZHB to weigh the evidence before it. *Id.* The ZHB is the sole judge of the credibility of witnesses and the weight afforded their testimony. *Id.* Assuming the record contains substantial evidence, we are bound by the ZHB's findings that result from resolutions of credibility and conflicting testimony rather than a capricious disregard of evidence. *Id.*

 A ZHB is free to reject even uncontradicted testimony it finds lacking in credibility, including testimony offered by an expert witness. *Id.* A ZHB does not abuse its discretion by choosing to believe the opinion of one expert over that offered by another. *Id.*

 Tri–County points out that "although economic concerns, i.e., the degree of profit from a use, are not governing with regard to constitutional challenges, if an ordinance, through its particular requirements, makes the development of a use permitted by the ordinance economically impossible, the ordinance is unconstitutional." *Montgomery Crossing Assocs. v.*

*Twp. of L. Gwynedd,* 758 A.2d 285, 290 (Pa.Cmwlth.2000) (quoting *Stahl v. U. Southampton Twp. Zoning Hearing Bd.,* 146 Pa.Cmwlth. 659, 606 A.2d 960, 967 (1992)).

■ Here, however, the ZHB determined, there was extensive, conflicting testimony as to whether a landfill would be economically feasible with a 40–feet height restriction. ZHB Mem. Op. at 18. Among other things, the ZHB stated that Objectors presented testimony that with different compaction rates available in the industry a 40–feet height restriction would allow for a viable landfill. ZHB Mem. Op. at 18. Our review of the record supports this determination. See R.R. at 425a–49a; 1297a–1303a. Specifically, contrary to Tri–County's assertions, Objectors' engineer directly refuted Tri–County's engineer's opinion that it would not be financially feasible to construct and operate a landfill with a 40–foot height limitation. R.R. at 425a. Objectors' engineer prepared a report and provided detailed testimony in support of this conclusion. *See* R.R. at 425a–49a; 1297a–1303a. As a result, the ZHB determined: "Tri–County did not meet its burden of showing that a 40–[foot] height restriction would keep [it] from being economically viable...." ZHB Mem. Op. at 18–19. Because the record supports the ZHB's determinations, we discern no error in the ZHB's conclusion that Tri–County did not meet its burden of showing the zoning ordinance's 40–foot height limitation effectively excludes landfill use.

### D. Dimensional Variance/Variance by Estoppel and Laches

#### 1. Dimensional Variance

Tri–County also asserts that, in improperly interpreting the zoning ordinance's definition of structure to include landfills, the trial court erred in failing to consider the substantial evidence demonstrating the propriety of granting a variance from the zoning ordinance's height restriction. Tri–County argues that the uses permitted in the R–1 zoning district include agricultural uses, residential uses, mobile home parks, churches, schools, hospitals, child care centers and campgrounds. It contends that it proved that the existence of old waste on the property, which is uncapped and for which monitoring is required, is a unique physical circumstance and condition of the property that makes it unusable for any use permitted in the R–1 district and results in unnecessary hardship.

Tri–County maintains that use of the property for a sanitary landfill would not alter the essential character of the neighborhood, particularly where, as the trial court recognized, the property was used for landfill purposes since the 1940s and is currently used as a transfer station, which according to the zoning ordinance, is the same use as a landfill. Further, Tri–County contends, because its proposed landfill would be operated in accordance with DEP regulations and pursuant to a DEP permit, including a "harms/benefits" analysis, the landfill operations would not be detrimental to the public welfare. Most significantly, Tri–County asserts, it also demonstrated that the imposition of the 40–foot height limitation would render a viable landfill on the property economically impossible.

Tri–County further asserts the ZHB made no specific findings with regard to Tri–County's alternative variance requests. It did not address the unique circumstances and significant hardship resulting from the fact that waste was deposited on essentially all of the property. Tri–County argues the ZHB failed to acknowledge that, given DEP's requirements of capping and the installation of a gas management system, the old waste renders the property

unusable for any of the permitted uses in the R–1 district. In simply accepting the ZHB's decision, Tri–County maintains, the trial court also failed to examine the substantial evidence that justifies the grant of a variance.

■ A ZHB may grant a variance when the following criteria are met:

(1) an unnecessary hardship will result if the variance is denied, due to the unique physical circumstances or conditions of the property; (2) because of such physical circumstances or conditions the property cannot be developed in strict conformity with the provisions of the zoning ordinance and a variance is necessary to enable the reasonable use of the property; (3) the hardship is not self-inflicted; (4) granting the variance will not alter the essential character of the neighborhood nor be detrimental to the public welfare; and (5) the variance sought is the minimum variance that will afford relief.

*Taliaferro*, 873 A.2d at 811–12.

■ A dimensional variance involves a request to adjust zoning regulations to use the property in a manner consistent with regulations, whereas a use variance involves a request to use property in a manner that is wholly outside zoning regulations. *Hertzberg v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 554 Pa. 249, 721 A.2d 43 (1998). The same criteria apply to use and dimensional variances. *Id.* However, in *Hertzberg*, our Supreme Court set forth a more relaxed standard for establishing unnecessary hardship for a dimensional variance, as opposed to a use variance.

■ Under *Hertzberg*, courts may consider multiple factors in determining whether the applicant established unnecessary hardship for a dimensional variance. These factors include the cost of the strict compliance with the zoning ordinance, the economic hardship that will result from denial of a variance, and the characteristics and conditions of the surrounding neighborhood. *Id.*

■ Although *Hertzberg* eased the requirements, it did not remove them. *Doris Terry Revocable Trust v. Zoning Bd. of Adjustment of City of Pittsburgh*, 873 A.2d 57 (Pa.Cmwlth.2005). An applicant must still present evidence as to each of the conditions listed in the zoning ordinance, including unnecessary hardship. *Id.* Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg. See, e.g., Lamar Advantage GP Co. v. Zoning Hearing Bd. of Adjustment of City of Pittsburgh*, 997 A.2d 423 (Pa.Cmwlth. 2010).

■ Here, although Tri–County asserts the ZHB did not make any specific findings supporting the denial of its dimensional variance request, as discussed above, the ZHB stated that Objectors presented evidence that with different compaction rates available in the industry, a landfill at a height of 40 feet would be viable. ZHB Mem. Op. at 18; R.R. at 422a–449a, 1297a–1303a. The ZHB also stated that Tri–County's expert acknowledged that a landfill with a 40–foot height restriction would be viable when considering other operations on the property. ZHB Mem. Op. at 18; S.R.R. at 107b. Based on these supported determinations, which indicate that Tri–County can operate in an economically viable manner while adhering to the zoning ordinance's 40–foot height limitation, no error is apparent in the ZHB's denial of Tri–County's dimensional variance request.

In addition, the ZHB found Tri–County currently operates a profitable business on the property as a transfer station. F.F. No. 75. Despite arguing it is entitled to a dimensional variance from the 40–foot height limitation for its proposed landfill, Tri–County ignores the ZHB's finding that it currently operates a profitable business on the property.

■ Moreover, "[a] variance may be granted only *upon proof that a substantial burden attends all dimensionally compliant uses of the applicant's property . . . ." Twp. of E. Caln v. Zoning Hearing Bd. of E. Caln Twp.*, 915 A.2d 1249, 1254 (Pa. Cmwlth.2007) (emphasis added). Here, the ZHB found, "[Tri–County] has been operating a transfer station for over 20 years, only 25.9 acres has been used for waste disposal and the remaining area can certainly be developed as [a] R–1 area presuming the present activities have as little impact as [Tri–County] suggests." ZHB Mem. Op. at 16. While Tri–County cites the testimony of its engineer in support of its argument that the property is unusable for any uses permitted in the R–1 district, the ZHB did not credit the testimony of this witness.

## 2. Variance by Estoppel/Laches

Alternatively, Tri–County argues it is entitled to relief under the theories of variance by estoppel and laches. Specifically, it asserts the Township knowingly allowed the landfill to operate on the property from the time it zoned the property R–1 in 1976 to the time DEP directed Tri–County to cease active waste disposal in 1990. Since that time, for over 20 years, Tri–County maintains, the Township knowingly allowed a transfer station to operate on the property, reflecting its understanding that landfill operations and the transfer station exist as the same non-conforming use, as such uses are defined in the zoning ordinance.

Tri–County also argues the Township's acceptance of the Tri–County access road for dedication in 1992 and its acceptance of host municipality fees reflect the Township's open acquiescence to the ongoing operation of the landfill/transfer station use on the property. It contends the sanction of laches is appropriate where, over the past 35 years, the Township acquiesced in the ongoing use of the property for the landfill/transfer station in a R–1 district. Tri–County maintains it relied on the Township's acquiescence to the continued use of the property for a landfill and made substantial expenditures, which even the ZHB acknowledged, based on the Township's understanding that the landfill is a valid nonconforming use on the property. Under these circumstances, Tri–County argues, unnecessary hardship would result if a variance by estoppel is not granted.

With regard to the doctrine of variance by estoppel, this Court previously explained:

> There are five factors relevant to whether a ZHB should grant a variance by estoppel.
>
> Such variances are appropriate when a use does not conform to the zoning ordinance and the property owner establishes all of the following: (1) a long period of municipal failure to enforce the law, when the municipality knew or should have known of the violation, in conjunction with some form of active acquiescence in the illegal use; (2) the landowner acted in good faith and relied innocently upon the validity of the use throughout the proceeding; (3) the landowner has made substantial expenditures in reliance upon his belief that his use was permitted; and (4) denial of the vari-

ance would impose an unnecessary hardship on the applicant.

For [a]pplicants to prevail under a variance by estoppel theory, they must prove the essential factors by clear, precise and unequivocal evidence.

*Pietropaolo v. Zoning Hearing Bd. of L. Merion Twp.*, 979 A.2d 969, 980 (Pa. Cmwlth.2009) (citations omitted).

■■ Laches may be imputed to a municipality that has stood by and permitted large expenditures to be made upon the faith of municipal consent informally or tacitly given. *Springfield Twp. v. Kim*, 792 A.2d 717 (Pa.Cmwlth.2002).

■■ Here, Tri–County's argument that it is entitled to a variance by estoppel or laches because the Township acquiesced to a "landfill/transfer station" use is problematic with regard to a dimensional variance. To that end, Tri–County does not assert there is a landfill or any other structure on its property that is anywhere near 140 feet in height, the height of its proposed landfill; therefore, the Township could not acquiesce to a structure of the height proposed by Tri–County here.

Further, while Tri–County repeatedly asserts the Township acquiesced to its "landfill/transfer station" use, the ZHB made several determinations that indicate a landfill and a transfer station are distinct uses, requiring different approvals and permits from DEP, and imposing different impacts on the surrounding community. *See* ZHB Mem. Op. at 15. To that end, the ZHB stated:

It should be noted that there is significant difference between a transfer station and a landfill operation. The transfer station as it exists today at the Tri–County site is operated within an enclosed building. The local trucks picking up municipal waste bring their load inside a structure where the load is dumped and those loads then are loaded onto much larger trucks and hauled away to a landfill. By definition the transfer station is simply an area where smaller trucks can be brought into a structure, off-loaded, and their waste transferred off-site. No refuge of any sort stays at the site. The transfer station permit requires that all waste be off site by 9:00 p.m. every day. There is not and has not been a landfill or waste disposal at this site since 1990. The transfer station is simply operated in an enclosed environment and there does not appear to be any significant odor, noise, lights, dust, particulate matter, or any other issue as to health, welfare and safety of the neighborhood beyond the use of trucks coming and going on the highway that affects this R–1 area. The landfill as proposed and described is significantly different in operation and scope on its impact on this R–1 area.

*Id.* Clearly, the Township could not have acquiesced to a landfill that has been closed since 1990. And, the presence of a different use, a transfer station, cannot support entitlement to equitable relief for the proposed landfill use.

In addition, as to Tri–County's argument concerning the payment of host fees, Tri–County's representative testified Tri–County has not paid host fees to the Township since it stopped disposing of waste (in 1990). R.R. at 233a. Further, as to Tri–County's argument regarding the dedication of the access road, Tri–County's argument acknowledges that the facility was used as a transfer station, not a landfill, when the access road was dedicated in 1992. Thus, these circumstances do not bolster Tri–County's argument that it is entitled to equitable relief to construct its proposed landfill.

Moreover, as set forth above, to obtain a variance by estoppel, Tri–County bore the burden of proving unnecessary hardship. As explained above, the ZHB determined

Tri–County did not meet its burden of proving unnecessary hardship. This determination is supported by the facts that Tri–County currently operates a profitable business on its property, a large portion of the property remains unused and could be developed for a use permitted in the R–1 district, and Tri–County can operate in an economically viable manner while adhering to the zoning ordinance's 40–foot height limitation.

For all the foregoing reasons, we affirm.

Judge McCULLOUGH did not participate in the decision in this case.

## ORDER

**AND NOW,** this 9th day of January, 2014, the order of the Court of Common Pleas of Mercer County is **AFFIRMED.**