IN THE COMMONWEALTH COURT OF PENNSYLVANIA

People's Property, LLC and     :
Annie Marie, LLC,     :
               Appellants     :
    :
             v.     :    No. 701 C.D. 2024
    :    Argued: April 8, 2025
Lower Nazareth Township Zoning     :
Hearing Board and Lower Nazareth     :
Township     :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY SENIOR JUDGE LEAVITT           FILED: June 27, 2025

People's Property, LLC (People's Property) and Annie Marie, LLC (Annie Marie) (collectively, Owners) have appealed an order of the Court of Common Pleas of Northampton County (trial court) that denied Owners' land use appeal regarding their properties located at 4683 Ash Drive, known as "Lot 99," and at 4673 Ash Drive, known as "Lot 97," in Lower Nazareth Township (Township). In so holding, the trial court affirmed the decision of the Township Zoning Hearing Board (Zoning Board) that Lots 97 and 99 are not lawful, nonconforming lots that can be developed for a reasonable use. The trial court also affirmed the Zoning Board's denial of variances from the Township's Floodplain Management Ordinance (Floodplain Ordinance)[1] to allow Lots 97 and 99 to be used for a residence with an accessory on-lot septic system. Owners contend that the trial court

---

[1] LOWER NAZARETH TOWNSHIP FLOODPLAIN MANAGEMENT ORDINANCE, No. 212-06-14, enacted June 11, 2014, *as amended*.

and the Zoning Board erred in holding that Lots 97 and 99 could not be developed for any purpose and in holding that Owners' evidence did not establish grounds for variances from the Floodplain Ordinance. Upon review, we reverse the trial court and remand the matter to the trial court for further proceedings.

**Background**

Lots 97 and 99 are located in the Township's low density residential zoning district (LDR District), which currently requires a minimum lot size of one acre. The two lots were created in the subdivision and development plan for Ridge View Estates East that was recorded on October 15, 1973. Each lot is approximately 0.33 acre in size.

By resolution of January 27, 1982, the Township Board of Supervisors (Township Supervisors) revoked its approval of the 1973 plan under authority of Ordinance No. 63 of 1977, known as the Township's Subdivision and Land Development Ordinance (SALDO). Reproduced Record at 142a-43a (R.R. __). Paragraph 1 of the resolution stated that "[*t*]*he final subdivision approval of* **lots** 5, 15-19, 25-31, 35-45, 49-58, 67-70, 91-96, **99**, as shown on the Plan of Ridge[ V]iew Estates East *is revoked* and *said plan is hereby recalled as to said lots and appurtenant subdivision improvements*." *Id*. at 143a. (emphasis added). Paragraph 2 of the resolution directed the then-developer, KBK Associates, "to submit subdivision and land development plans and supporting documents and material consistent with Township Ordinance No. 63 *before continuing the development of its above referenced holdings*." R.R. 143a (emphasis added). In a "whereas" clause, the resolution stated that "substantial development has occurred only in Phase I consisting of lots: 6-14, 32, 33, 34, **97**, 98 of [KBK Associates'] holdings[.]" R.R. 142a (emphasis added). In short, the 1982 resolution did not apply at all to Lot 97

2

and, as to Lot 99, merely required the future development of Lot 99 to conform to the SALDO.

On February 13, 1987, KBK Associates recorded a new subdivision plan (1987 Plan) for Ridge View Estates East, titled "Plan of Lots—Phase II." R.R. 138a. The notes to the 1987 Plan state, in pertinent part, as follows:

> Note 1. The subdivision plan of Ridge[ V]iew Estates East, approved by the [Township Supervisors] on August 9, 1973, is recorded in the Office of the Recorder of Deeds for Northampton County in Plan Book 31, Page 2.
>
> Note 2. *This plan has been prepared to meet the directions set forth by the [Township Supervisors] Resolution adopted the 27th day of January, 1982.*

*Id*. (emphasis added). At the bottom of the 1987 Plan is a small inset map of lots that shows "Phase II" lots in shading but without lot numbers. That inset map also shows the location of an "associated off[-]site storm water control facility." *Id*. At the approximate location of Lot 97 (outside the shaded lots) is an asterisk that refers to a note on the 1987 Plan that states as follows:

> *\* Flood Plain Preservation Area—*
>
> *This land to be merged with adjoining lot* or dedicated or sold to Lower Nazareth Township or Northampton County or the Lehigh Valley Conservancy, or some other similar organization.

R.R. 138a (emphasis added). The 1987 Plan did not further define "this land" to be "merged with adjoining lot" or dedicated either to a political subdivision or a conservancy. *Id*.

Additional notes on the 1987 Plan state as follows:

*Lot Numbers 91, 92 and 93 are not suitable for on-lot sewage disposal systems at this time*. Earth fill material shall be placed

3

to final grade and may be tested according to [the Department of Environmental Resources (D.E.R.)] regulations.[2]

Lot Numbers 94, 95 and 96 have been filled with earth and graded in September, 1984. Testing for site suitability shall be according to D.E.R. regulations.

R.R. 138a (emphasis added).

In 1988, the Township adopted its first floodplain ordinance. The current Floodplain Ordinance, which took effect in 2014, placed all of Lot 99 and most of Lot 97 within the 100-year flood plain.

On March 22, 1988, KBK Associates conveyed Lots 95-99 in a single deed to William J. Schnierlein and Kenneth A. Erney, co-partners, who conveyed these lots in a single deed to Kenneth A. Erney Jr. (Erney) on November 27, 2002. In 2020, Erney conveyed these lots to five separate LLCs, each owned or operated by Adam Pooler (Pooler). Pertinent to this appeal, People's Property purchased Lot 99, and Annie Marie purchased Lot 97.

### Land Use Appeal on Lot 99

On December 15, 2020, People's Property applied for a permit to install an on-site septic system on Lot 99. The Township's zoning and floodplain administrator, Lori Seese (Seese), refused to process the application for the stated reason that it did not identify the use for which the sewage system would be installed and did not comply with the Floodplain Ordinance. People's Property appealed to the Zoning Board to require a review of the application or, in the alternative, the grant of a variance from the Floodplain Ordinance.

On February 3, 2021, People's Property applied for a building permit for Lot 99, which was denied for the stated reason that a single-family dwelling was

---

[2] The Pennsylvania Department of Environmental Resources is now known as the Pennsylvania Department of Environmental Protection.

4

not permitted on Lot 99 under the Floodplain Ordinance. The Floodplain Ordinance permits land in the floodplain to be used for "front, side, and rear yards," but "such yards are not to be used for on-site sewage disposal systems[.]" FLOODPLAIN ORDINANCE, §4.01.F. Because all of Lot 99 is located in the floodplain district, "the proposed septic systems are within the setbacks." Original Record (O.R.), Item 6 at 2b (Zoning Officer's File (ZA2021-04), March 9, 2021, letter denying application for single-family dwelling). The denial letter stated that a variance was needed for the proposed single-family dwelling and accessory use of Lot 99.

People's Property appealed to the Zoning Board, seeking a determination that Lot 99 is a lawful nonconforming lot that can be developed for a reasonable use under Section 1409.C of the Township's Zoning Ordinance,[3] ZONING ORDINANCE, §1409.C, and a variance from Article 4 (Sections 4.01, 4.01.F, and 4.02.B) and Article 8 of the Floodplain Ordinance. FLOODPLAIN ORDINANCE art. 4, 8.

**Land Use Appeal on Lot 97**

On February 23, 2021, Annie Marie applied for building and sewer permits for Lot 97, which were denied for the same reasons, *i.e.*, that the applications did not comply with the Floodplain Ordinance. Specifically, the proposed septic systems, the rear yard, and a majority of the side yards "are within the floodplain[.]" O.R., Item 6 at 3b (Zoning Officer's File (ZA2021-05), March 9, 2021, letter denying application for single-family dwelling). The denial letter stated a variance was needed for the proposed single-family dwelling and accessory use of Lot 97.

---

[3] LOWER NAZARETH TOWNSHIP ZONING ORDINANCE, enacted November 28, 2001, *as amended* (Zoning Ordinance).

Annie Marie appealed the denials to the Zoning Board. It also requested a determination that Lot 97 is a lawful nonconforming lot that can be developed for a reasonable use under Section 1409.C of the Zoning Ordinance and a variance from Article 4 (Sections 4.01, 4.01.F, and 4.02.B) and Article 8 of the Floodplain Ordinance.

The appeals of Annie Marie and People's Property were consolidated. The parties agreed that testimony regarding Lot 99 would be incorporated into the Lot 97 appeal.

### Zoning Board Hearings

The Zoning Board held six hearings.

Pooler, the principal of the five LLCs, testified that prior to purchasing the five lots, he contacted Seese, who advised that the lots were not "buildable lots" and would not pass the percolation test necessary for an on-lot septic system. Notes of Testimony (N.T.), 3/23/2021, at 13; R.R. 177a. However, the percolation tests were "successful" and approved by the Township's sewage enforcement officer. N.T., 3/23/2021, at 13-14; R.R. 177a-78a. Pooler applied for, and was granted, building permits for Lots 95 and 96, on which two homes have been built.

Seese's letter of September 25, 2017, was introduced into evidence. Referring to "4663--4683 Ash Drive-Floodplain and Zoning Analysis," the letter stated, in pertinent part, as follows:

> Dear Mr. Pooler:
>
> Per your request, I have reviewed the single-family dwelling applications submitted for the five lots located at 4663 thru [sic] 4683 Ash Drive. You requested they be reviewed for compliance with the Zoning Ordinance and the [T]ownship's Floodplain Ordinance. My comments are as follows:
>
> 1. Zoning—*These five lots are existing non*[]*conforming lots located in the* [*LDR District*]. The lots are all less than a half-

6

acre. The current minimum lot size for a single-family dwelling is 1 acre. That being said, *the non[]conforming lot size does not prevent the lots from being developed.* The setbacks depicted on the approved subdivision plan would apply to these lots.

2. Floodplain Ordinance—*All five lots are located either partially or entirely with[in] the AE zone of the 100-year floodplain* (FIRM Map Panel #42095C0255E, effective 7/16/14). An image from [the Federal Emergency Management Agency's (FEMA)] website is attached. I have outlined the parcels and their locations within the floodplain below.

| Parcel # | Address | Portion in Floodplain |
|---|---|---|
| [*Lot 99*] | 4863[sic] Ash Drive | *All* |
| [Lot 98] | 4677 Ash Drive | Majority |
| [*Lot 97*] | 4673 Ash Drive | *Majority* |
| [Lot 96] | 4669 Ash Drive | Small Portion |
| [Lot 95] | 4663 Ash Drive | Small Portion |

*Pursuant to [ ] Township Floodplain Ordinance #212-06-14, a single[-]family dwelling is not permitted in the Floodplain District (Article IV, Uses).*

*Furthermore, Section 8.03, Design and Construction Standards requires that no part of the on-site sewage system be located within the identified floodplain area. This means that Lots [99, 98 and 97] are not buildable for single[-]family dwellings.*

In regard to Lots [96 and 95], however, it is possible that single[-]family dwellings could be constructed on these lots since smaller portions of these lots are within the floodplain. This is assuming compliance with the Floodplain Ordinance and other applicable State and Local regulations, particularly for on-lot sewage facilities.

7

R.R. 100a-01a (emphasis added). The AE Zone is an area with a risk of flooding such that it requires purchase of flood insurance.[4]

Pooler testified that after he bought the properties, the Township offered him $10,000 for Lots 97-99. Pooler paid $32,000 for each lot and did not accept the offer.

Owners presented several expert witnesses. Roger Lehmann (Lehmann), a certified Pennsylvania sewage enforcement officer, testified that in July of 2020, his soil tests identified two areas suitable for the installation of a septic system. Lehmann explained that state law permits the installation of septic systems in floodplains but not in "floodways," which are designated by FEMA and refer to streams that overflow their banks on occasion. N.T., 3/23/2021, at 72; R.R. 237a. Neither Lot 99 nor 97 is located in a floodway. Lehmann testified that he has supervised the installation of septic systems in floodplains throughout Pennsylvania, and "they function appropriately." N.T., 3/23/2021, at 73-74; R.R. 238-39a. Lehmann opined that Lot 99 was appropriate for the proposed on-lot system.

Lehmann proposed an elevated septic system designed to prevent sewage from leaking into the environment. During a flood, the effluent from the septic tank is pumped into the mound. The pressurized system prevents effluent from penetrating drain fields, which treats the effluent, or from surcharging into the house.

---

[4] The Floodplain Ordinance defines "AE Area/District" as "those areas identified as an AE Zone on the [Flood Insurance Rate Maps (FIRM)] included in the [Flood Insurance Study (FIS)] prepared by FEMA for which Base Flood Elevations have been provided[.]" FLOODPLAIN ORDINANCE, §3.03.B. According to FEMA, "Zone AE is a high-risk area. Mandatory flood insurance purchase requirements and floodplain management standards apply." FEMA, *Read your Flood Map*, https://www.fema.gov/sites/default/files/documents/how-to-read-flood-insurance-rate-map-tutorial.pdf (last visited June 26, 2025).

8

Lehmann then responded to questions from Steven Nordahl, vice chair of the Zoning Board, as follows:

> [] Nordahl: And what about the effluent that's in the [drain] field once it's flooded, it's going to discharge.
>
> [Lehmann:] It's going to go down. When the flood waters recede, for all intent and purposes, they go down and anything inside the mound is going to go vertically as it does when the water is put into it from the sewage disposal system. The systems are installed in flood plains all across the Commonwealth of Pennsylvania.
>
> [] Nordahl: *But in this case, a flood plain in this situation with the actual field, that field is going to be saturated; it's going to have effluent in it, and it's going to be mixing in with the flood waters which means it's going to discharge into the flood waters. Any residual that's there is going to discharge into the flood waters.*
>
> [Lehmann:] *I guess anything is possible.*

N.T., 3/23/2021, at 76-77; R.R. 241a-42a (emphasis added).

Jason Bailey (Bailey), a civil engineer, also testified about Owners' proposed septic system, opining that it constituted the minimum variance and least modification necessary to allow reasonable use of Lots 97 and 99. Further, the system would comply with Pennsylvania's laws on sewage regulation. Bailey stated that the addition of 2,000 cubic feet of fill would raise the base flood elevation by "a half inch. But then you have to take that over the actual area of the entire upslope waterway and it would be negligible at that point in time." N.T., 3/23/2021, at 93; R.R. 258a. Bailey opined that a variance would not "increase[] flood elevations [or] additional threats to public safety[.]" N.T., 3/23/2021, at 97; R.R. 262a.

Jeremy Madaras (Madaras), a licensed professional engineer with expertise in floodplains, testified that the floodplain on Lot 99 has a base flood elevation of 353 feet. The residence is proposed at an elevation of 355 feet, 2 feet

9

above the floodplain. N.T., 12/21/2021, at 71-72; R.R. 359a-60a. "The top of soil" for the proposed septic system would be at elevation 353.5 feet. N.T., 12/21/2021, at 72; R.R. 360a. He opined that the fill proposed for the house and the septic system will not increase the base flood elevation because the house will be built on a slab, "outside of the floodplain." *Id.* Madaras also opined that the proposed house and septic system would not present a risk to the public health, safety and welfare.

Madaras opined that the 1987 Plan is ambiguous on the contours of the "Floodplain preservation area." N.T., 2/24/2022, at 13; R.R. 558a. The asterisk on the inset map could be construed to mean "all lots which are unshaded on the original plan." *Id.* Even so, the note does not specify whether the "land" for preservation included "all three lots, one lot, or a portion of a lot[.]" *Id.* The note did not specify which lot was the "adjoining lot." *Id.* Madaras found no restrictive covenant recorded for either Lot 97 or 99. Madaras opined that the 1987 Plan did not effect a restriction on the development of Lots 97-99.

The Township intervened and offered the testimony of Seese. She testified that Lots 95 and 96 could be developed with single-family homes. However, Lots 97-99 could not be developed because of their location in the AE Zone. She so advised Pooler before he bought the lots and again in 2020.

Seese testified that in 2019, the Township decided that Lots 95-99 could be useful in addressing the Township's stormwater issues. Seese and Lori Stauffer, the Township manager, informed Erney (then owner of the lots) of the Township's interest in purchasing his lots for stormwater remediation and obtained an appraisal. The Township advised the appraiser that the lots were not buildable due to their location in the AE Zone. Erney declined the Township's offer. In February 2020, shortly after his purchase of the lots, Pooler requested copies of the Township's

10

appraisals for purposes of entertaining the Township's potential purchase of the lots. Pooler rejected the Township's offer of $10,000.

The Township presented the expert witness testimony of Mark Bahnick (Bahnick), a professional engineer, who reviewed the 1987 Plan. Bahnick opined that the "Flood Plain Preservation Area" note at the bottom of the 1987 Plan applied to Lots 97-99. N.T., 1/25/2022, at 24; R.R. 444a. He explained that "off-site improvements" such as stormwater controls, open space, or "recreation areas" would not be shown "on" the affected lots, but would nevertheless be established by the recorded plan. N.T., 1/25/2022, at 40; R.R. 460a. Bahnick explained that "the preparation of a record plan is a voluntary action by the landowner" and opined that the landowner's 1987 Plan made Lots 97-99 "non-building lots." N.T., 1/25/2022, at 41, 43; R.R. 461a, 463a.

Regarding Owners' appeal of the Township's handling of its sewage permit, the Township offered the testimony of Christopher Noll (Noll), its sewage enforcement officer. He commented on the sewage permit applications but neither granted nor denied the applications. He opined that the applications did not satisfy Act 537[5] or the Township's on-lot sewage disposal ordinance because there was not a submitted planning module. Noll acknowledged that state law does not prohibit a septic system in floodplains.

The Zoning Board also heard from numerous neighbors who opposed Owners' applications. They testified to the increased frequency and intensity of storms that cause flooding and negatively impact their personal safety and property.

---

[5] Act 537 refers to the Pennsylvania Sewage Facilities Act, Act of January 24, 1966, P.L. (1965) 1535, *as amended*, 35 P.S. §§750.1-750.20a (Act 537).

11

The neighbors presented, *inter alia*, photographs and videos of floods that impacted Lots 97-99.

## Zoning Board Decision

On June 10, 2022, the Zoning Board issued one decision denying all three appeals.

Crediting Bahnick's testimony, the Zoning Board found that the note on the 1987 Plan established that Lots 97-99 were to be merged with Lot 96 or sold "as a nondevelopable property to an outside agency." Zoning Board Decision at 33-34, Finding of Fact No. 393. As such, the Board found that "there can only be 2 homes constructed on the collection of [L]ots 95, 96, 97, 98, and 99[,]" which has already occurred on Lots 95 and 96. *Id*. at 34, Finding of Fact No. 394. The Board found that Lots 97-99 are "nondevelopable" and cannot be considered lawful nonconforming lots for purposes of the Zoning Ordinance. *Id*. at 34, Finding of Fact No. 403.

The Zoning Board found Pooler not credible. It found that he knew that the subject lots could not be developed with single-family residences under the Floodplain Ordinance. Pooler's testimony that he believed he could remedy the situation with variances was "arbitrary and irresponsible." Zoning Board Decision at 34, Finding of Fact No. 399. Any hardship was created by Pooler, who took title to Lots 95-99 in five separate LLCs. *Id*., Finding of Fact No. 401.

The Zoning Board discredited Madaras' testimony that a single-family house built on a slab two feet above the base flood elevation would have no tangible effect on the floodplain. It also rejected his opinion that the 1987 Plan did not render Lots 97 and 99 nondevelopable.

12

The Zoning Board discredited Lehmann's testimony because he did not consider the Floodplain Ordinance when he designed the sewage disposal system for Lot 99. Further, Lehmann acknowledged that it was "possible" that effluent could discharge into the flood waters under his proposed septic system. Zoning Board Decision at 35; Finding of Fact No. 411.

Based on the foregoing findings, the Board concluded that Owners failed to meet their burden of proof for a variance from the Floodplain Ordinance for Lots 97 and 99.

Owners appealed to the trial court, which took no additional evidence.

### Trial Court Decision

By amended order of May 13, 2024,[6] the trial court affirmed the Zoning Board's decision. The trial court held that the record supported the Zoning Board's finding that Lots 97 and 99 are not developable as lawful, nonconforming lots entitled to reasonable use under Section 1409.C of the Zoning Ordinance. The Township Supervisors' 1982 resolution and the 1987 Plan eliminated any possible development of Lots 97 and 99. The trial court held that the Zoning Board's decision on this point was properly based on Bahnick's expert testimony that interpreted the 1987 Plan. The trial court further reasoned that Owners failed to prove the existence of a nonconforming lot because there was no evidence that "the subject land" had been developed with a single-family residence when the Floodplain Ordinance became effective in 2014. Trial Court Op., 5/13/2024, at 10 (quoting *Smalley v. Zoning Hearing Board of Middletown Township*, 834 A.2d 535, 539 (Pa. 2003)).

The trial court affirmed the Zoning Board's denial of a variance from the Floodplain Ordinance to allow single-family residences and on-site septic

_____

[6] The original order was dated April 29, 2024, but amended to correct the docket number.

systems on Lots 97 and 99. The trial court held that Owners failed to satisfy the standards for a variance set forth in Section 111.E.3 of the Zoning Ordinance and Section 7.02.F of the Floodplain Ordinance. Trial Court Op., 5/13/2024, at 12. The Zoning Board acted within its discretion to discredit Madaras' testimony that the proposed development on Lots 97 and 99 would not be detrimental to the public welfare or affect the base flood elevation. As the trier of fact, the Zoning Board was entitled to draw conclusions on the credibility of the witnesses, accepting some, all, or none of the testimony proffered. Trial Court Op., 5/13/2024, at 13.

Owners appealed to this Court.

**Appeal**

On appeal,[7] Owners present three issues for our review.[8] First, Owners argue that the trial court erred in affirming the Zoning Board's determination that Lots 97 and 99 are not lawful, nonconforming lots by reason of the approved 1973 subdivision plan. Second, Owners argue that the Zoning Board erred in denying their application for a variance from the Floodplain Ordinance to construct a single-family residence and on-site septic system on Lots 97 and 99. Finally, Owners argue that the trial court and Zoning Board erred in not addressing their argument that the zoning officer improperly usurped the authority of the Township's sewage enforcement officer by rejecting the septic permits based on requirements in the Floodplain Ordinance. We address these issues *seriatim*.

## I. Lawful Nonconforming Lots

---

[7] "Where the trial court receives no additional evidence on appeal from a zoning hearing board's decision, an appellate court's standard of review is to determine whether the board committed an abuse of discretion or an error of law." *Harrisburg Gardens, Inc. v. Susquehanna Township Zoning Hearing Board*, 981 A.2d 405, 410 (Pa. Cmwlth. 2009).

[8] Owners list the following questions for our review in the Statement of Questions Involved:

> 1. Did the [trial court] err and apply an incorrect standard of review when it affirmed the [Zoning Board's] determination that Lots 97 and 99 are not lawfully nonconforming lots pursuant to the 1973 subdivision plan and were rendered undevelopable by the 1987 subdivision plan, where the 1987 subdivision plan does not relate to and was never recorded against Lots 97 and 99?
>
> 2. Did the [trial] court err as a matter of law or abuse its discretion by affirming the [Zoning Board's] determination that [Owners] failed to establish entitlement to variances from requirements of the Floodplain Ordinance where the [trial] court improperly applied the variance standards imposed by the Zoning Ordinance and where [Owners] satisfied all variance standards set forth in the Floodplain Ordinance?
>
> 3. Did the [trial] court err as a matter of law or abuse its discretion by failing to conclude that the zoning officer's rejection of the septic permits usurped the authority of the sewage enforcement officer and that septic permits must be issued because [Owners] complied with all requirements of Act 537?

Owners Brief at 5.

15

In their first issue, Owners argue that the trial court erred in affirming the Zoning Board's determination that Lots 97 and 99 are not lawful, nonconforming lots. The Zoning Board erred in finding that a note on the 1987 Plan effected a restrictive covenant on the use and development of Lots 97-99. Lot 98 was not even the subject of the Zoning Board proceeding. More problematic is the notion that an asterisk on a development plan can create a restrictive covenant. Such covenants are "not favored in the law" and must be "strictly construed;" further, they may not be "*extended by implication unless the parties clearly so understand and intend.*" Owners Brief at 22 (quoting *Sandyford Park Civic Association v. Lunnemann*, 152 A.2d 898, 900 (Pa. 1959)) (emphasis added). The 1987 Plan made no reference to Lot 99 and, at most, a possible reference to Lot 97 because the asterisk was placed in its approximate location. Simply, the 1987 Plan did not expressly state that Lot 97 or 99 was not to be developed for any reasonable use, and the 1987 Plan is not cited in any of the deeds for Lots 95-99. Owners argue that the property rights conferred by the deeds to Lots 95-99 "have to be adjudicated by the [trial] court in a separate legal action." Owners Brief at 22. That legal question is beyond the jurisdiction of the Zoning Board.

Owners contend that Lot 97 remains a lawful, nonconforming lot because its 1973 approval was not revoked by the 1982 resolution of the Township Supervisors. As to Lot 99, the 1982 resolution merely required that future development of Lot 99 comply with the 1977 SALDO. Finally, the Floodplain Ordinance was not adopted until 1988.

Owners argue that the question of whether the note in the 1987 Plan extinguished the vested development rights of Lots 97 and 99 created by the 1973 subdivision plan is a question of law subject to a *de novo* review. The trial court

16

applied an improper standard by deferring to the Zoning Board's credibility determinations on this question instead of conducting a *de novo* review of the legal question.

In sum, Owners argue that both Lots 97 and 99 have retained a vested development right that was created by the 1973 subdivision plan. That right was not extinguished by the Township Supervisors' 1982 resolution or the 1987 Plan.

In response, the Zoning Board reiterates its finding that the inset map on the 1987 Plan placed Lots 97, 98, and 99 in a "Floodplain Preservation Area." Zoning Board Brief at 22 (citing R.R. 138a). The credited testimony of Bahnick established that "off-site improvements" such as stormwater controls or preservation areas did not have to be shown on the inset map. Zoning Board Brief at 23 (quoting N.T., 1/25/2022, at 40-44; R.R. 460a-64a).

The Township's arguments echo those of the Zoning Board. The Township acknowledges Lots 97-99 are "lots" that "may be used, developed or built upon" under the Zoning Ordinance. Township Brief at 12. However, these lots cannot be developed for residential use under the Floodplain Ordinance. The Township argues that Lots 97-99 were rendered nondevelopable by the 1987 Plan. Restrictions in a "recorded subdivision plan are enforceable even if these [restrictions] are not set forth in the deeds" to the affected lots. *Id.* (citing *Doylestown Township v. Teeling*, 635 A.2d 657, 660 (Pa. Cmwlth. 1993)).

We begin with a review of the Zoning Ordinance provisions relevant to a "Nonconforming Lot," which is defined in Section 202 as follows:

> A lot which does not conform with the minimum lot width or area dimensions specified for the district where such lot is situated, but was lawfully in existence prior to the effective date of this Ordinance or is legally established through the granting of a variance by the Zoning Hearing Board.

17

ZONING ORDINANCE, §202. Section 1409.C.2 of the Zoning Ordinance governs the development of "Nonconforming Lots" and states, in pertinent part, as follows:

> 2. Nonconforming Lots.
>
>> a. *Permitted structures and uses may be constructed* or expanded on a non[]conforming lot of record *only in compliance with the following requirements*:
>>
>>> (i) Lawfully Existing. *A use may only be developed on a non[]conforming lot if it is a lot of record that lawfully existed prior to the adoption of this Ordinance or an applicable subsequent amendment.*
>>>
>>> (ii) Setbacks. Yard setbacks and other requirements of this Ordinance shall be complied with unless a variance is granted by the Zoning Hearing Board, or unless the Zoning Hearing Board allows construction under the following waiver:
>>>
>>> . . . .
>>>
>>> (iii) *Only one principal use and its customary accessory uses that are permitted by right in that District may be developed on a nonconforming lot.*
>>>
>>> (iv) In a LDR District, as an absolute minimum, in no case shall a variance be granted for the development of a principal building on a nonconforming lot with minimum lot area of less than 5,000 square feet or a minimum lot width at the minimum building setback line of less than 45 feet.
>>>
>>> (v) For any variance or special exception request under this Section, *the Zoning Hearing Board shall consider if any reasonable use could be made of the property other than a proposed use* that would less significantly adversely affect the established character of an existing residential neighborhood.
>>>
>>> (vi) The nonconformity shall not have been self-created.

18

(vii) Contiguous nonconforming lots under common or closely related ownership shall be considered one lot.

(viii) *Any lot proposed to use an on-lot septic system shall meet all [Department of Environmental Protection (DEP)] requirements*, plus shall have sufficient open area that would also meet D.E.P requirements for a second drainfield, for use in case the first drainfield fails.

ZONING ORDINANCE, §1409.C.2 (emphasis added).

In its opinion, the trial court used the terms "nonconforming lot" and "nonconforming use" interchangeably. However, they are distinct legal concepts. As explained in *Loughran v. Valley View Developers, Inc.*, 145 A.3d 815, 821 (Pa. Cmwlth. 2016), a nonconforming lot is one that "has been rendered undersized by the passage of an ordinance requiring a larger lot size than what was previously required for the permitted use in the zoning district where the lots are located; in such instances, the undersized lot becomes a 'nonconforming lot.'"[9]

Here, the Zoning Ordinance defines a "nonconforming lot" as one that (1) fails to conform to area or dimension requirements, and (2) was lawfully in existence prior to the effective date of the Zoning Ordinance. ZONING ORDINANCE, §202. Lots 97 and 99 are each less than a half-acre in size and were created by the 1973 subdivision plan and lawfully in existence before the Zoning Ordinance set the minimum lot size for the LDR District at one acre. Lots 97 and 99 are nonconforming lots and can be developed, provided they meet the requirements of Section 1409.C.2 of the Zoning Ordinance.

---

[9] In contrast, a nonconforming use is "a use predating the subsequent prohibitory zoning restriction." *Hafner v. Zoning Hearing Board of Allen Township*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009).

The Zoning Board held that the Township Supervisors' 1982 resolution and the 1987 Plan prohibited any development of Lots 97 and 99. Thus, it never addressed whether they could be put to a reasonable use in accordance with Section 1409.C.2 of the Zoning Ordinance. For several reasons, we disagree with the Zoning Board's conclusion that the 1982 resolution and the 1987 Plan rendered Lots 97 and 99 nondevelopable.

The 1982 resolution revoked "[t]he final subdivision approval" of 1973 for Lot 99 in light of the then-recently adopted SALDO. R.R. 143a. The only consequence of the revocation was to require the submission of "subdivision and land development plans and supporting documents and material consistent with" the SALDO before Lot 99 could be developed. *Id.* Lot 99 remained a valid lot. The 1982 resolution did not revoke the 1973 subdivision plan as to Lot 97; to the contrary, it stated that "substantial development has occurred" in "Phase I consisting of [L]ots . . . 97." R.R. 142a. Thus, Lot 97 also remained a valid lot.

Nor did the 1987 Plan render Lots 97 and 99 undevelopable. This determination of the Zoning Board turned entirely on the inset map that placed an asterisk in the approximate location of Lot 97 with a notation that this "land" would be merged or sold to a government or conservancy. R.R. 138a. The note does not specify this "land" by lot number or by a metes and bounds description. In finding that the "land" included the entirety of Lots 97, 98 and 99, the Zoning Board read words into the 1987 Plan that do not appear. Further, the word "lot," as used in the note, cannot signify three lots. Likewise, it cannot be determined whether the "adjoining lot" is Lot 96 or Lot 98. R.R. 138a.

Bahnick's testimony, which was credited, did not overcome these omissions in the 1987 Plan. Bahnick testified that "[o]ff-site improvements" such

20

as stormwater controls would not be shown on the affected lots on the development plan. N.T., 1/25/2022, at 40; R.R. 460a. This testimony is belied by the 1987 Plan document, which shows the "associated off[-]site storm water control facility" on the inset map and the lots affected. R.R. 138a. Further, the 1987 Plan expressly states that "Lot Numbers 91, 92 and 93 are not suitable for on-lot sewage disposal systems at this time." R.R. 138a. It contains a similar statement for Lot Numbers 94, 95, and 96. *Id*. Bahnick did not explain why similar clarity was not used in the 1987 Plan if the intention was to place Lots 97-99 into preservation.

A restrictive covenant must be "strictly construed" and is "not to be extended by implication unless the parties clearly so understand and intend." *Sandyford Park Civic Association*, 152 A.2d at 900. Simply, KBK Associates' intent for a "Floodplain Preservation Area" in the 1987 Plan cannot be determined. First, the note expresses an inchoate preservation intent, at best, because it recites different possibilities that might take place in the future. Second, the "land" placed in that area was not identified by lot number or by any meaningful description. Finally, Bahnick could not testify to KBK Associates' intent because he did not prepare the 1987 Plan.

The 1987 Plan is entitled "Ridge[ V]iew Estates East – Phase II." R.R. 138a. It specifies the dimensions, setback lines and square footages for Lots 15-19, 26-31, 35-43, 51, and 91-96, which are expressly shown and numbered. Phase II did not include Lots 97-99. No future purchaser of Lot 97 or 99 would have any reason to consider the 1987 Plan because it is a plan that addressed other lots in the development. If a future purchaser of Lots 97 or 99 did get out a magnifying glass to examine the tiny inset map on the 1987 Plan, that examination, for the reasons set

21

forth above, would lead to the conclusion that there was no restrictive covenant on the use of either Lot 97 or Lot 99.

The interpretation of the 1987 Plan is a question of law. The Zoning Board used Bahnick's opinion to conclude that the 1987 Plan set aside Lots 97 and 99 for preservation. Leaving aside the inconsistencies and omissions in Bahnick's testimony, his opinion is not a substitute for legal analysis of the language in the operative documents. The trial court erred in upholding the Zoning Board without doing a legal analysis of the scope and meaning of the language of the 1987 Plan.

We hold that Lots 97 and 99, by definition, are nonconforming lots under Section 202 of the Zoning Ordinance. ZONING ORDINANCE, §202. Because the Zoning Board held that Lots 97 and 99 had been set aside for preservation, it did not address whether Lots 97 and 99 have met the requirements of Section 1409.C.2 of the Zoning Ordinance and, thus, are eligible for a reasonable use. Therefore, we remand the matter to the trial court to consider whether Lots 97 and 99 satisfy the requirements of Section 1409.C.2 of the Zoning Ordinance.

## II. Variance from the Floodplain Ordinance

Owners argue, next, that the Zoning Board erred in denying their application for variances to construct single-family residences and accessory on-site septic systems on Lots 97 and 99. Owners contend that the "dimensional constraints on these lots" have created an unnecessary hardship that makes compliance with the Floodplain Ordinance impossible and prevents any reasonable use of Lots 97 and 99 absent a variance. Owners Brief at 29. Owners further contend that they have satisfied the substantive standards for a variance set forth in Section 7.02 of the Floodplain Ordinance. FLOODPLAIN ORDINANCE, §7.02. Their expert witness demonstrated that two viable drain fields had been identified for both lots and meet

22

all state regulations. They also testified that the proposed development would not present a risk to public health, safety, and welfare and would not increase the base flood elevation. Owners contend that the trial court erred in applying the variance standards in Section 111 of the Zoning Ordinance to their applications, which are irrelevant to this case, which concerned a variance from the Floodplain Ordinance, not the Zoning Ordinance.

Owners contend that Pooler's knowledge of "the dimensional nonconformities" of Lots 97 and 99 at the time of his purchase did not establish that the hardship was self-created. Owners Brief at 31. The right to develop such a lot "runs with the land and vests in subsequent buyers." *Id.* (citing *N. Pugliese, Inc. v. Palmer Township Zoning Hearing Board*, 592 A.2d 118, 121 (Pa. Cmwlth. 1991) (*Pugliese*)). "[I]t makes no difference whether the application for the variance is sought by the original owner or a successor in title." *Id.* In *Pugliese*, this Court held that it was error for the zoning board to hold that a purchaser of a property created the hardship because he bought the lot with knowledge that it was undersized.

In response, the Zoning Board argues that it properly denied the variances because it found that the proposed development on Lots 97 and 99 would negatively affect the safety and welfare of the residents of the Township. The Floodplain Ordinance prohibits single-family dwellings on slabs and above-ground septic systems on land located in the AE Zone. Pooler's failure to do due diligence into these restrictions is a hardship of his own making, as the Zoning Board properly found.

The Township raises similar arguments as those raised by the Zoning Board.

23

We begin with a review of the pertinent Floodplain Ordinance provisions: Article 2 (Sections 2.02 and 2.04), Article 4 (Sections 4.01, 4.01.F, and 4.02.B), and Article 8, from which Owners sought variances.

The Floodplain Ordinance requires all development to satisfy its provisions. It states:

> A *Permit shall be required before any construction or development is undertaken within any area of the Lower Nazareth Township*. Construction and development activities subject to permit requirements in the Floodplain District regardless of value include, but are not limited to: construction, reconstruction, placement, replacement, expansion, extension, repair, or other improvement of uses or structures; placement of manufactured homes; mining; dredging; filling; grading; logging; paving; excavation; drilling operations.

FLOODPLAIN ORDINANCE, §2.02. Regarding the permit application procedures and requirements, the Floodplain Ordinance states as follows:

> A. Application for such a Permit shall be made, in writing, to the Floodplain Administrator on forms supplied by Lower Nazareth Township. Such application shall contain the following:
>
> > 1. Name and address of applicant.
> >
> > 2. Name and address of owner of land on which proposed construction is to occur.
> >
> > 3. Name and address of contractor.
> >
> > 4. Site location including address.
> >
> > 5. Listing of other permits required.
> >
> > 6. Brief description of proposed work and estimated cost, including a breakout of flood-related cost and the market value of the building before the flood damage occurred where appropriate.
> >
> > 7. A plan of the site showing the exact size and location of the proposed construction as well as any existing buildings or structures.

24

8. State whether or not the structure includes a basement.

B. If any proposed construction or development is located entirely or partially within any identified floodplain area, applicants for Permits shall provide all the necessary information in sufficient detail and clarity to enable the Floodplain Administrator to determine that:

1. all such proposals are consistent with the need to minimize flood damage and conform with the requirements of this and all other applicable codes and ordinances;

2. all utilities and facilities, such as sewer, gas, electrical and water systems are located and constructed to minimize or eliminate flood damage;

3. adequate drainage is provided so as to reduce exposure to flood hazards;

4. structures will be anchored to prevent floatation, collapse, or lateral movement;

5. building materials are flood-resistant;

6. appropriate practices that minimize flood damage have been used; and

7. electrical, heating, ventilation, plumbing, air conditioning equipment, and other service facilities have been designed and located to prevent water entry or accumulation.

FLOODPLAIN ORDINANCE, §2.04.A-.B.

The Floodplain Ordinance limits uses in the Floodplain District as follows:

Section 4.01 Uses Permitted in the Floodplain District

The following uses and others are permitted in the Floodplain District, *provided they are allowed in the underlying zoning district and provided they do not involve any grading or filling which would cause any increase in flood elevations or frequency, and provided they comply with other sections of this Ordinance*:

. . . .

25

F. *Front, side, and rear yards and required lot area in any zoning district, provided such yards are not to be used for on-site sewage disposal systems and further provided that no land in the Floodplain District shall qualify in computing the minimum district area where specified in the Lower Nazareth Township Zoning Ordinance.*

. . . .

H. Sanitary collection mains and storm sewers with the approval of the Township Engineer and the Board of Supervisors. These systems shall be designed to minimize or eliminate infiltration of flood waters into the systems and discharges from the systems into the flood waters.

I. Floodproofing of lawfully existing non[]conforming structures and lawfully existing non[]conforming uses within structures.

FLOODPLAIN ORDINANCE, §4.01.F, .H-.I (emphasis added). The Floodplain Ordinance further provides that "[*a*]*ll structures and accessory structures not otherwise specifically permitted under Section 4.01 or allowed as a Special Permit Use under Section 4.03*[10]" are prohibited uses in the floodplain district. FLOODPLAIN ORDINANCE, §4.02.B (emphasis added).

Finally, Article 8 of the Floodplain Ordinance, titled "technical provisions," provides, in pertinent part:

Section 8.03 Design and Construction Standards:

The following minimum standards shall apply for all construction and development proposed within any identified floodplain area:

. . . .

---

[10] Uses in a floodplain district that require a special permit from the Zoning Board include parking lot, private roads and driveways, active recreational use, grading of lands, sewage treatment plant, sealed public water supply wells, stormwater management, repair or expansion of riparian buffers, public and private dams, water monitoring devices, public utility facilities, fishing hatcheries, and other uses similar to the above. FLOODPLAIN ORDINANCE, §4.03.

*C. Water and Sanitary Sewer Facilities and Systems*

*1. All new or replacement water supply and sanitary sewer facilities and systems shall be located, designed and constructed to minimize or eliminate flood damages and the infiltration of flood waters.*

*2. Sanitary sewer facilities and systems shall be designed to prevent the discharge of untreated sewage into flood waters.*

*3. No part of any on-site sewage system shall be located within any identified floodplain area except in strict compliance with all State and local regulations for such systems. If any such system is permitted, it shall be located so as to avoid impairment to it, or contamination from it, during a flood.*

*. . . .*

FLOODPLAIN ORDINANCE, §8.03 (emphasis added).

In support of their request for variances from the Floodplain Ordinance, Owners explain that Lots 97 and 99 cannot be developed for single-family dwelling with on-site septic systems in strict conformity with the provisions of the Floodplain Ordinance because of "dimensional constraints."[11]  Owners Brief at 29.  On that basis, Owners seek a use variance from the Floodplain Ordinance.

The Floodplain Ordinance allows land in a floodplain district to be used for "[f]ront, side, and rear yards and required lot area in any zoning district, *provided such yards are not to be used for on-site sewage disposal systems*[.]"  FLOODPLAIN ORDINANCE, §4.01.F (emphasis added).  Uses that are not permitted under Section 4.01 or allowed by a special permit under Section 4.03 are prohibited in the

---

[11] "A dimensional variance involves a request to adjust zoning regulations to use the property in a manner consistent with regulations, whereas a use variance involves a request to use property in a manner that is wholly outside zoning regulations."  *Tri-County Landfill, Inc. v. Pine Township Zoning Hearing Board*, 83 A.3d 488, 520 (Pa. Cmwlth. 2014).

floodplain district. *Id*., §4.02.B. Read together, a single-family dwelling and on-site septic system cannot be built on a floodplain. Only "[f]ront, side and rear yards" can be located within the floodplain district. *Id*., §4.01.F.

All of Lot 99 is located within the floodplain district. The record shows that Lot 99's "front, sides and rear yards are entirely within the floodplain[;] [and t]he proposed septic systems are within the setbacks." O.R., Item 6 at 2b (Zoning Officer's File (ZA2021-04), March 9, 2021, letter denying application for single-family dwelling). Therefore, Owners cannot construct a single-family dwelling or an on-site septic system on Lot 99 absent a variance from Section 4.01F of the Floodplain Ordinance.

As to Lot 97, the proposed septic system is located "entirely within the floodplain;" "[t]he rear yard is entirely in the floodplain[;] and a majority of the side yards are within the floodplain[.]" O.R., Item 6 at 3b (Zoning Officer's File (ZA2021-05), March 9, 2021, letter denying application for single-family dwelling). The proposed single-family house is not located in the AE Zone. However, Owners cannot construct the accessory on-site septic systems on Lot 97 absent variance relief from Section 4.01.F of the Floodplain Ordinance.

Relevant to a variance, the Floodplain Ordinance states, in pertinent part, as follows:

> A. *If compliance with any of the requirements of this Ordinance would result in an exceptional hardship to a prospective builder, developer or landowner, the Zoning Hearing Board may, upon request, grant relief from the strict application of the requirements.*
>
> B. *Variance applications shall be submitted to the Zoning Hearing Board pursuant to the provisions of Lower Nazareth Township Zoning Ordinance Article 1 and the supplementary procedures and conditions defined in Section 7.02 of this ordinance.* The Zoning Hearing Board shall solicit testimony

28

from the Township Engineer, or other qualified and licensed professional engineer, to review and comment on technical matters pertaining to this Ordinance.

FLOODPLAIN ORDINANCE, §7.01 (emphasis added).

Article 1 of the Zoning Ordinance, entitled "General Provisions and Administration," addresses matters ranging from ordinance interpretation to permit procedures. ZONING ORDINANCE, §§105, 108. Article 1 creates the Zoning Board, identifies its function, and sets forth the rules on form and content for appeals and applications submitted to the Zoning Board, and hearing time limits. *Id*., §§111.A, .E-.G. Article 1 obligates the Zoning Board, *inter alia*, to "hear requests for variances filed with the Board in writing by any landowner (or any tenant with the permission of such landowner)." *Id*., §111.E.3(a).[12]

---

[12] The Zoning Ordinance's standards for a zoning ordinance variance came from Section 910.2 of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10910.2. Section 111.E.3(b) of the Zoning Ordinance states:

> b. The Board may grant a variance only within the limitations of State law. The [MPC] as amended provides that all of the following findings must be made, where relevant:
>
> > (i) *There are unique physical circumstances or conditions* (including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property) *and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of this Ordinance in the neighborhood or district in which the property is located*; and
> >
> > (ii) Because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the Zoning Ordinance and a variance therefore [is] necessary to enable the reasonable use of the property; and
> >
> > (iii) Such unnecessary hardship has not been created by the applicant; and
> >
> > (iv) The variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially

29

The Floodplain Ordinance addresses variances as follows:

*Requests for variances shall be considered by the Zoning Hearing Board in accordance with the procedures contained in Lower Nazareth Township Zoning Ordinance Article 1 and the following*:

A. *No variance shall be granted within any Identified Floodplain Area that would cause any increase in* [*the Base Flood Elevation, or*] *BFE*. In a Zone A Area, BFEs are determined using the methodology in Section 3.03.C.

....

D. *If granted, a variance shall involve only the least modification necessary to provide relief*.

E. In granting any variance, Lower Nazareth Township shall attach whatever reasonable conditions and safeguards it considers necessary in order *to protect the public health, safety, and welfare, and to achieve the objectives of this Ordinance*.

F. In reviewing any request for a variance, Lower Nazareth Township shall consider, at a minimum, the following:

1. That there is good and sufficient cause.

2. That failure to grant the variance would result in exceptional hardship to the applicant.

3. That the granting of the variance will

a. neither result in an unacceptable or prohibited increase in flood elevations, additional threats to public safety, or extraordinary public expense,

---

or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and

(v) *The variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue*.

ZONING ORDINANCE §111.E.3(b) (emphasis added).

30

> b. nor create nuisances, cause fraud on, or victimize the public, or conflict with any other applicable state or local ordinances and regulations.
>
> . . . .
>
> Notwithstanding any of the above, however, all structures shall be designed and constructed so as to have the capability of resisting the base flood.

FLOODPLAIN ORDINANCE, §7.02 (emphasis added).

In sum, the Floodplain Ordinance authorizes a variance where strict compliance "would result in an "exceptional hardship[.]" FLOODPLAIN ORDINANCE, §7.01.A. Such variance applications "shall be submitted" to the Zoning Board in writing. *Id.*, §7.01.B; ZONING ORDINANCE, §111.E.3(a). However, the Floodplain Ordinance specifies that it is only the "procedures" in Article 1 of the Zoning Ordinance that apply to floodplain variances. FLOODPLAIN ORDINANCE, §7.02. The substantive variance standards in the Floodplain Ordinance, not the substantive variance standards in the Zoning Ordinance, applied to Owners' variance applications. ZONING ORDINANCE, §111.E.3(b). Notably, the standard for a floodplain variance is "exceptional hardship" not "unnecessary hardship." *Cf*, FLOODPLAIN ORDINANCE, §7.01.A; ZONING ORDINANCE, §111.E.3(b)(i).

In denying Owners' variance applications from the Floodplain Ordinance, the Zoning Board discredited Lehmann's and Madaras' testimony that the proposed development would have no effect on flooding or public safety. Indeed, all of Owners' witnesses were discredited, and all the testimony of residents and Township employees offered in opposition to the variance was credited. Based on its credibility determinations, the Zoning Board concluded that Owners "failed to meet [their] burden of proof for the issuance of the variances requested for the subject lots." Zoning Board Decision at 35, Findings of Fact and Conclusions of

31

Law No. 413. In reaching this conclusion, the Zoning Board did not cite the applicable law or do any legal analysis.

The trial court affirmed the Zoning Board. In doing so, it cited and applied the substantive variance standards in Article 1 of the Zoning Ordinance. The trial court erred. To be sure, "the credibility of witnesses and the weight to be accorded to witness testimony are matters for the Zoning Board in its capacity as fact[]finder." *Hawk v. City of Pittsburgh Zoning Board of Adjustment*, 38 A.3d 1061, 1065 (Pa. Cmwlth. 2012). However, the Zoning Board's decision must conform to the law. The trial court erred in using the substantive variance standards in the Zoning Ordinance rather than those set forth in Sections 7.01 and 7.02 of the Floodplain Ordinance to review the Zoning Board's decision. This error requires a reversal.

### III. Septic Permits

Finally, Owners argue that the trial court and Zoning Board erred in not addressing their argument that the zoning officer improperly usurped the authority of the Township's sewage enforcement officer by rejecting the septic permits based on requirements in the Floodplain Ordinance. However, the record shows that the zoning officer returned the incomplete sewer permit application for Lot 99, which failed to identify the primary use of that lot. A review of the record also shows that Noll, the sewage enforcement officer, eventually reviewed the sewage permit application and prepared a comment letter. Noll also testified that the applications did not satisfy the Township sewage ordinance because there is no sewage planning module in place for the subject lots.

A review of the septic permits under Act 537 and the sewage ordinance is premature in light of the fact that Owners cannot develop Lots 97 and 99 for

32

residential use absent a use variance from the Floodplain Ordinance. The trial court's failure to address Owners' argument on the zoning officer's improper review of the septic permits was a harmless error.

**Conclusion**

Lots 97 and 99 are nonconforming lots under Section 202 of the Zoning Ordinance. ZONING ORDINANCE, §202. The 1987 Plan purported to create a "Floodplain Preservation Area," but it did not state that Lots 97 and 99, in whole or in part, were placed therein. R.R. 138a. We reverse the trial court's affirmance of the Zoning Board's holding that Lots 97 and 99 are not developable and remand the matter to the trial court to address whether Lots 97 and 99, as nonconforming lots, meet the requirements of Section 1409.C.2 of the Zoning Ordinance and, thus, are eligible for a reasonable use. The trial court's findings on this question shall be "based on the record below as supplemented by the additional evidence, if any." Section 1005-A of the MPC, 53 P.S. §11005-A.[13]

---

[13] Added by the Act of December 21, 1988, P.L. 1329. Section 1005-A states:

> *If, upon motion, it is shown that proper consideration of the land use appeal requires the presentation of additional evidence, a judge of the court may hold a hearing to receive additional evidence, may remand the case to the body, agency or officer whose decision or order has been brought up for review, or may refer the case to a referee to receive additional evidence*, provided that appeals brought before the court pursuant to section 916.1 shall not be remanded for further hearings before any body, agency or officer of the municipality. If the record below includes findings of fact made by the governing body, board or agency whose decision or action is brought up for review and the court does not take additional evidence or appoint a referee to take additional evidence, the findings of the governing body, board or agency shall not be disturbed by the court if supported by substantial evidence. *If the record does not include findings of fact or if additional evidence is taken by the court or by a referee, the court shall make its own findings of fact based on the record below as supplemented by the additional evidence, if any.*

53 P.S. §11005-A (emphasis added).

The 2014 Floodplain Ordinance placed the majority of Lot 97 and all of Lot 99 in the AE Zone. Owners sought variances to construct a single-family residence and accessory on-site septic system on each lot. The procedures set forth in Article 1 of the Zoning Ordinance applied to Owners' variance applications, but the substantive standards in Article 1 did not. The trial court erred in applying the substantive standards for a zoning variance to Owners' applications for a variance from the Floodplain Ordinance. For this reason, we reverse the trial court's affirmance of the Zoning Board's denial of the variances and remand the matter to the trial court to consider Owners' floodplain variances under the substantive standards set forth in Sections 7.01 and 7.02 of the Floodplain Ordinance.

For these reasons, we reverse the trial court's May 13, 2024, order and remand the matter for further proceedings consistent with this opinion.

_____
MARY HANNAH LEAVITT, President Judge Emerita

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

People's Property, LLC and           :
Annie Marie, LLC,              :
            Appellants        :
                                    :
         v.                 :   No. 701 C.D. 2024
                                    :
Lower Nazareth Township Zoning   :
Hearing Board and Lower Nazareth  :
Township                         :

# **O R D E R**

AND NOW, this 27th day of June, 2025, the order of the Court of Common Pleas of Northampton County, dated May 13, 2024, in the above-captioned matter, is REVERSED. The matter is REMANDED to the Court of Common Pleas of Northampton County for further proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge Emerita